**FAX TELECOMMUNICACIONES INC., Plaintiff–Appellant,**

v.

**AT&T, Defendant–Appellee,**

**Michael Gilmartin and Richard Stotts, Defendants.**

Docket No. 97–7374

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 1997.

Final brief submitted Nov. 20, 1997.

Decided March 10, 1998.

---

Stacey Van Malden, Charles Wallshein, Freeport, NY, for Plaintiff–Appellant.

Elizabeth M. Sacksteder, Alan M. Unger, Sidley & Austin, New York City (Sharon O. Gans, AT&T Law Division, AT&T Corp., Liberty Corner, NJ, on the brief), for Defendant–Appellant.

Before: FEINBERG, WALKER, Circuit Judges, and GOLDBERG, Judge.*

\* The Honorable Richard Goldberg of the United States Court of International Trade, sitting by designation.

JOHN M. WALKER, JR., Circuit Judge:

Plaintiff-appellant Fax Telecomunicaciones Inc. ("Fax"), a former purchaser of AT&T long-distance telephone services, brought this action alleging breach of contract, fraudulent misrepresentation, and fraudulent inducement to contract against defendant-appellee AT&T ("AT&T"), for which Fax sought a declaratory judgment, specific performance, and compensatory and punitive damages. In essence, Fax claims that AT&T promised to file a new contract tariff with the Federal Communications Commission ("FCC") for the telephone services it proposed to provide to Fax. Based on this promise, Fax purchased long-distance telephone services from AT&T. However, AT&T never filed the new contract tariff with the FCC, and instead billed Fax pursuant to the applicable filed tariff, which was significantly more expensive. Because Fax only paid AT&T what Fax calculated it owed under the promised rates, AT&T counterclaimed for an additional $2,321,390.71 in unpaid telephone charges which Fax owed under the filed tariff, plus pre-judgment interest. The United States District Court for the Eastern District of New York (Joanna Seybert, *District Judge*) granted AT&T's motion for summary judgment in part and dismissed it in part, granting judgment for AT&T on its counterclaim and dismissing all but one of Fax's claims based on the district court's application of the filed rate doctrine. Fax appeals, contending that the filed rate doctrine does not bar its dismissed claims.

We affirm.

## BACKGROUND

### I. *Regulatory Scheme*

Before presenting the facts of this case, it will be helpful to briefly describe the regulatory structure governing interstate telecommunications. Interstate telecommunications carriers are regulated pursuant to the Federal Communications Act of 1934, 47 U.S.C. § 151 *et seq.* ("FCA"). As a provider of long distance telephone services, AT&T is

classified as a common carrier under the FCA. *See* 47 U.S.C. § 153(h). As a common carrier, AT&T must file with the Federal Communications Commission ("FCC") a tariff showing all charges for each telephone service it provides, as well as all classifications, practices, and regulations affecting such charges. *See* 47 U.S.C. § 203(a). Carriers are prohibited from providing communications services except pursuant to a filed tariff, and may not charge, demand, collect, or receive a rate other than the rate listed in the applicable tariff. *See* 47 U.S.C. § 203(c). In addition, carriers are prohibited from unreasonably discriminating between customers in charges, practices, classifications, regulations, facilities or services. *See* 47 U.S.C. § 202(a). The FCC is empowered to review filed rates, and to reject any rates deemed unjust, unfair, or unreasonable. *See* 47 U.S.C. § 205(a).

Beginning in 1991, the FCC adopted rules and regulations allowing carriers to establish "contract tariffs." *See In the Matter of Competition in the Interstate Interexchange Marketplace,* CC Docket No. 90–132, 6 F.C.C.R. Rec 5880, 1991 WL 638354 (F.C.C.)("*Matter of Competition*"). These rules were designed to increase flexibility for customers and to promote competition among carriers. A carrier may negotiate a contract tariff individually with a customer. At least one customer must enter into a contract with the carrier pursuant to the new tariff in order for the carrier to file the contract tariff. 47 C.F.R. § 61.3(m). The contract tariff must be filed at least fourteen days prior to the effective date of the contract. *Matter of Competition* ¶¶ 91, 121. The tariff must include the terms of the contract, a description of the services to be provided, the price for these services, the minimum volume commitments for each service, any volume discounts, as well as any other classifications, practices, and regulations affecting the contract rate, thereby complying with the filing requirements of 47 U.S.C. § 203(a). *Id.* at ¶¶ 121, 122. After fourteen days, the contract tariff is effective,

assuming neither the FCC nor any member of the public objects. *Id.* at ¶¶ 91, 121, 122; 47 C.F.R. §§ 61.58(c)(6), 61.42(c)(8). The FCC will presume that rates filed in a contract tariff are reasonable. *Matter of Competition* ¶ 74. The carrier must make the contract tariff generally available to other similarly situated customers. *Id.* at ¶¶ 91, 129. In this way, the FCA's prohibition against discrimination among customers is not violated. *See* ¶¶ 126–32.

## II. *Factual and Procedural History*

Fax, a New York corporation, operates telephone arcades in Brooklyn and Queens, New York. A telephone arcade is a store, open to the public, containing several private telephone booths. A customer wishing to place a telephone call from one of the booths must first pay a deposit. Customers are billed based on the destination and duration of their call. When their call is complete, the amount of their bill is deducted from their deposit, and the difference is refunded. The overwhelming majority of Fax's customers placed calls to Latin America, with 80% to 85% of Fax's total call volume placed to Colombia alone.

Beginning August 1993, David Ospino, Fax's president, met with representatives of AT&T to discuss the purchase of long-distance services. At the time, Fax was using a different carrier, but hoped to negotiate a more competitive deal with AT&T. For its purposes, AT&T hoped to make greater inroads in the local Latin American community by establishing Fax as its central lead account for various arcades serving the Latin American market, all of which could then be serviced under one billing umbrella.[1] AT&T representatives believed that Fax, with its Latin American ownership, would be better able to market AT&T service to other Latin American calling arcades in Brooklyn and Queens than would AT&T's own representatives.

On December 21, 1993, AT&T sales representative Richard Stotts presented Ospino

---

1. By pooling their calling volumes with Fax, smaller arcades could take advantage of greater volume discounts. Beginning in January 1994, when Fax initiated service with AT&T, AT&T directed eight other calling arcades to Fax to receive AT&T long-distance service under Fax's service umbrella.

with a "Network Services Commitment Form" offering Fax a three-year plan for service under AT&T's "Uniplan Conquest" tariff for dedicated service. Dedicated service provides a customer with direct access to AT&T long-distance services by bypassing "switched" local service. Dedicated service is less expensive than switched service. In order to receive dedicated service directly from AT&T, and therefore receive Conquest service, Fax needed to install a "T1 Pipe." Fax ordered a T1 pipe system from AT&T, and made a $3,500 deposit on its installation. However, AT&T never installed the system. Therefore, Conquest service was never available to Fax.

At the same December meeting, Stotts also presented a draft version of an amended Conquest tariff, which would include greater discounts based on Fax's calling volume. Eventually, this amended Conquest tariff was to have been filed as a contract tariff with the FCC. Ospino signed the offering with the understanding that Fax would receive service under the "CustomNet" tariff until AT&T could file the contract tariff. The CustomNet tariff bills at a higher rate than the Conquest tariff then on file with the FCC, and at a considerably higher rate than the proposed amended Conquest tariff. However, Ospino understood and AT&T represented orally that Fax would be retroactively re-rated upon the filing of the contract tariff, so that Fax would never actually pay the CustomNet rates. Technically, AT&T could not actually re-rate charges retroactively. However, Stotts attests that AT&T regularly did so effectively by applying discounts and bonuses to customer bills. Fax never signed a contract for CustomNet service.

Fax commenced service with AT&T in early January 1994. On or about January 14, 1994, Ospino and Stotts had another meeting. At that time, Stotts presented an unsigned letter describing the services that AT&T would provide to Fax under the amended Conquest tariff, and the rates that AT&T would charge for those services. Allegedly, this letter contained numerous typographical errors, mistakes, and omissions which should have been apparent to Ospino.[2] Stotts informed Ospino that these new rates soon would be filed with the FCC.

It was then that Fax's problems with AT&T began. Fax received its first bill from AT&T in February 1994. To Ospino's surprise, Fax had been billed using the higher rates in the CustomNet tariff, rather than the rates quoted in the unsigned letter of January 14, 1994. When Ospino contacted AT&T representatives Stotts and Fabio Herrera, they informed him that the contract tariff was being processed, and that his next bill would include a credit to Fax to reflect the new tariff rate. Ospino computed his payment to AT&T based on the rates promised in the unsigned letter of January 14, 1994, and remitted approximately $75,000 to AT&T.

In March 1994, Fax received a second bill from AT&T. Again, Fax had been charged the higher CustomNet rate, and this bill included a past amount due under the first bill of $120,000. Herrera told Ospino that he need not worry, and assured him that the next bill would reflect the appropriate credits. As he had done the month before, Ospino calculated the amount he thought due under the promised rate, and remitted approximately $85,000 to AT&T.

In March 1994, Ospino met with AT&T representative Michael Gilmartin to discuss Fax's billing problems. Gilmartin promised to investigate the matter. Gilmartin was aware that Fax was charging customers only $.57 per minute for calls to Colombia, even though Fax was then being charged more than $.57 per minute by AT&T. In fact, Gilmartin had assisted Fax in preparing local newspaper advertisements promoting the $.57 per minute rate.

**2.** Stotts received an "Authority to Quote" letter ("ATQ") from Stephan Brae, bid manager at AT&T's competitive necessity group. Stotts rewrote the letter in layman's terms for Ospino, and it is this writing on which Ospino relied. Among the errors in the letter are its references to charges per minute, rather than charges per second. Fax admits that it was aware of this error, and claims that it did not rely on that error in computing the amount of money it believed it owed to AT&T.

In April 1994, and despite these repeated inquiries by Ospino and repeated assurances by AT&T employees, Fax received another bill from AT&T charging the higher Custom-Net rate. Following his regular practice, Ospino remitted approximately $90,000 to AT&T based on his own calculations of the proper rate. According to Ospino, Gilmartin assured Ospino that the past due amount and high charges were in error.[3] Similar events transpired in May 1994. Beginning in April, the AT&T collections department began telephoning Ospino and threatening to disconnect his service.

Finally, in June 1994, Gilmartin informed Ospino that AT&T could not provide long-distance service to Fax at the rates quoted in the January 14, 1994 letter. The promised rate structure was not consistent with the terms of the Conquest tariff then on file with the FCC. Nor was the promised rate structure consistent with the terms of AT&T's CustomNet tariff, pursuant to which Fax received long-distance telephone service. On June 23, 1994, AT&T, through Gilmartin, offered a new proposal to Fax for switched phone service, but Fax declined this offer. Gilmartin told Ospino that AT&T would discontinue service if Ospino did not sign a new contract for service under a different tariff. As of June 1994, Fax stopped making payments to AT&T.

In September, after nearly three months of negotiation between Fax's attorney and AT&T, AT&T offered Fax a credit of $769,-423 against Fax's past due balance. This credit adjustment was based on the difference between the rates Fax would have been charged under the Conquest tariff on file with the FCC and the rates Fax actually was charged under the CustomNet tariff.[4] AT&T's offer was contingent upon Fax's signing a new contract for Conquest service and paying the remainder of its past due bill. Even accepting this credit, however, Fax's bill would have remained three times the amount it actually collected from its customers. The rates originally promised to Fax in the unsigned January 14, 1994 letter were not made available, and AT&T was not willing to file an amended Conquest tariff offering those rates as a contract tariff. Fax did not sign a new contract or pay its bill, and in October, AT&T discontinued services to Fax.

Subsequently, in October 1994, Fax obtained services from Saetel, another calling center, and did so until Saetel left the business in July 1995. Saetel, in turn, obtained service from AT&T. According to Fax, Saetel charged Fax a rate similar to that originally promised by AT&T.

According to Stotts, when AT&T made its original offer to Fax, AT&T was in the process of renegotiating the rate that it pays Colombia for use of Colombia landlines during calls initiated in the United States ("the settlement rate"). Stotts claims that the prices in the unsigned letter of January 14, 1994 reflected discounts based on the expected lower settlement rate with Colombia. Stotts claims to have "found out through the corporate grapevine" that AT&T's negotiations with Colombia collapsed in February 1994, about one month after Fax initiated service with AT&T. Stotts Aff. at 5.

It is undisputed that AT&T employee Stotts offered to provide AT&T long distance services to Fax at rates significantly lower than any on file with the FCC, and that Stotts and his colleague Fabio Herrera repeatedly assured Fax both that AT&T would file a contract tariff incorporating those lower rates and that Fax would not be liable for any charges over and above those rates. As a result of these assurances, Fax charged the public $.57 per minute for long-distance calls to Colombia, a rate significantly lower than the CustomNet rate Fax was being charged by AT&T. Moreover, AT&T directed eight other calling centers to purchase long-distance service from Fax at its artificially depressed prices, thereby increasing Fax's ultimate liability. Yet it took six months for AT&T to finally inform Fax that it could not provide service under the promised terms. In short, the undisputed facts indicate that

---

**3.** Gilmartin filed an affidavit in the district court, denying that he ever promised Ospino that Fax would be charged according to the rate structure outlined in the letter of January 14, 1994.

**4.** Recall that because no T1 pipe was ever installed, Fax was never eligible for Conquest service.

AT&T may have acted with fraudulent intent and at the very least was negligent. Fax responded as any sensible corporation would. It sued.

On September 29, 1994, Fax brought this action in the New York State Supreme Court asserting state common law contract and tort claims against AT&T.[5] Specifically, Fax alleged, *inter alia*, (1) that AT&T intentionally and fraudulently misrepresented its long distance rates to Fax; (2) that AT&T fraudulently induced Fax to increase its calling volume in reliance on the availability of the misrepresented rates; (3) that AT&T breached its contract with AT&T by billing Fax for service under the CustomNet tariff, rather than the misrepresented rates; and (4) that AT&T breached its contract for the installation of the T1 pipe. Fax sought (1) a declaratory judgment that the January 14, 1994 unsigned letter is a binding agreement between Fax and AT&T; (2) specific performance of that contract; and (3) a declaratory judgment that AT&T contracted to install the T1 pipe. In the alternative, Fax sought compensatory and punitive damages based on AT&T's breach of contract, fraudulent inducement to contract, and fraudulent misrepresentation. On November 18, 1994, AT&T removed the action to the United States District Court for the Eastern District of New York, claiming federal question jurisdiction under the FCA. After answering and counterclaiming for payment of Fax's past-due balance, AT&T moved for summary judgment, pursuant to Fed.R.Civ.P. 56, dismissing Fax's claims and in favor of AT&T's counterclaims. The district court granted AT&T's motion, except that it refused to dismiss Fax's claim that AT&T breached its contract to install the T1 pipe. AT&T consented to judgment on that issue, and the district court awarded judgment of $3,140 plus pre-judgment interest to Fax. Fax appeals from the remainder of the district court's judgment, dismissing its remaining claims and awarding damages of $2,321,-390.71 plus pre-judgment interest to AT&T. At oral argument, we asked the parties to submit supplemental briefs regarding the basis for subject matter jurisdiction, whether administrative remedies were available to Fax, and the applicability of the doctrine of primary jurisdiction. On November 7, 1997, AT&T submitted a supplemental brief; Fax responded by letter brief on November 20, 1997.

## DISCUSSION

### III. *Standard of Review*

■■ We review the grant of summary judgment *de novo*. *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 100 (2d Cir.1997). In doing so, we "view the evidence in the light most favorable to the party opposing summary judgment." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir.1995). The " 'mere existence of *some* alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.' " *Davidson v. Scully*, 114 F.3d 12, 14 (2d Cir.1997) (emphasis in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986)). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### IV. *Removal*

■ As a preliminary matter, we must decide whether the district court properly heard this action. Although Fax neither objected to removal nor challenged the jurisdiction of the district court, we have an obligation to determine *sua sponte* whether the district court had jurisdiction to hear the case. *See Barbara v. New York Stock Exchange, Inc.*, 99 F.3d 49, 53 (2d Cir.1996); *Caffery v. New York Cent. R.R. Co.*, 324 F.2d 711, 712 (2d Cir.1963) (per curiam); *see also Westmoreland Capital Corp. v. Findlay*, 100 F.3d 263, 266 (2d Cir.1996); *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 605 (2d Cir.1988).

■ Fax originally filed this action in state court. Pursuant to 28 U.S.C. § 1441(a), any

---

**5.** Fax's complaint included Gilmartin and Stotts as defendants; however, Fax voluntarily dis-   missed these defendants.

civil action filed in state court may be removed by a defendant to federal court if the federal courts would have original subject matter jurisdiction over the action. *See Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). Because the parties to the present action are not of diverse citizenship, subject matter jurisdiction must turn on the existence of federal question jurisdiction. *See Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 2429–30, 96 L.Ed.2d 318 (1987); 28 U.S.C. § 1331. Removal is proper only if the federal question appears plainly on the face of a "well-pleaded complaint." *See Caterpillar,* 482 U.S. at 392, 107 S.Ct. at 2429–30; *Gully v. First Nat'l Bank,* 299 U.S. 109, 112–13, 57 S.Ct. 96, 97–98, 81 L.Ed. 70 (1936). Thus, a plaintiff may avoid federal jurisdiction by pleading only state law claims, even where federal claims are also available, and even if there is a federal defense. *See Caterpillar,* 482 U.S. at 392–93, 107 S.Ct. at 2429–30; *Marcus v. AT&T Corp.,* 138 F.3d 46, 52 (2d Cir.1998); *Hernandez v. Conriv Realty Assoc.,* 116 F.3d 35, 38 (2d Cir.1997).

■ A claim that federal law preempts all state law causes of action in a given area of the law is ordinarily only a defense to a plaintiff's suit, and accordingly provides no basis for removal. *See Louisville & Nashville R.R. Co. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908) (anticipated federal defense forms no basis for removal). "[T]herefore, the general rule is that even if a state law based cause of action is preempted by federal law, the case cannot be removed." *Hernandez,* 116 F.3d at 38. However, "[o]n occasion ... the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Caterpillar,* 482 U.S. at 393, 107 S.Ct. at 2430 (internal quotations omitted). Where state law within a certain field is thus subject to "complete preemption," a complaint pleading state law claims in that field is removable to federal court. *Id.; Metropolitan Life,* 481 U.S. at 63–64, 107 S.Ct. at 1546–47; *Marcus,* 138 F.3d at 52–54; *Hernandez,* 116 F.3d at 38.

In the present case, Fax's complaint purported to plead only state law causes of action. Yet, the defendant was allowed to remove the action, claiming that federal question jurisdiction existed under the FCA. *See Fax Telecommunicaciones v. AT&T,* 952 F.Supp. 946, 948 (E.D.N.Y.1996). The district court did not explain its reasons for permitting removal, but presumably it relied on our decision in *Nordlicht v. New York Tel. Co.,* 799 F.2d 859, 862 (2d Cir.1986), where we held that state law claims concerning the liabilities and obligations of telecommunications carriers arising from their rates and billing practices were completely preempted by federal common law. *See also Ivy Broadcasting Co. v. American Tel. & Tel. Co.,* 391 F.2d 486, 491 (2d Cir.1968).

After the district court issued its decision in this case, we decided *Marcus.* In *Marcus,* we reconsidered *Nordlicht* in light of the Supreme Court's opinion in *Metropolitan Life,* which limited the availability of complete preemption removal to "the very narrow range of cases where 'Congress has clearly manifested an intent' to make specific action within a particular area removable." *Marcus,* 138 F.3d at 54 (quoting *Metropolitan Life,* 481 U.S. at 66, 107 S.Ct. at 1547–48). We concluded that after *Metropolitan Life,* "federal common law does not completely preempt state law claims in the area of interstate telecommunications," *Marcus,* 138 F.3d at 54, and stated that *Nordlicht* was no longer the law insofar as it expressed a contrary view. *Id.* at 55–56. While we permitted removal on another ground not present in this case, we did not do so on the basis of complete preemption. *Marcus* governs here. Fax has pled only state common law claims sounding in contract and tort. That its claims concern the rates and billing practices of a carrier does not afford a basis for removal by the defendant. In sum, complete preemption removal was not available to AT&T.

■ Nor was removal proper pursuant to the "artful pleading" doctrine. Under that doctrine, a plaintiff may not avoid removal "by framing in terms of state law a complaint

the real nature of [which] is federal, ... or by omitting to plead necessary federal questions in a complaint." *Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 27 (2d Cir. 1988) (internal citations and quotations omitted); *see also In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425, 1430 (2d Cir. 1993). In *Marcus*, we held that case to be removable pursuant to the artful pleading doctrine. The plaintiffs had alleged in their complaint that AT&T breached its warranty to disclose the true nature of its billing practices, pursuant to AT&T's contract with the plaintiffs. 138 F.3d at 55–56. However, the only contracts between AT&T and the *Marcus* plaintiffs were the tariffs AT&T filed with the FCC. Moreover, these tariffs were not simply contracts between the parties, they were federal law. *Id.* at 55–56. Accordingly, despite the artful pleading of the complaint, the plaintiffs' breach of warranty claim arose under federal law and was therefore removable. *Id.* at 55–56.

In the present action, Fax's breach of contract claim is based on an alleged contract—the unsigned letter of January 14, 1994—that is independent of the rate on file with the FCC. Whether or not this contract exists or is enforceable, it is not the filed rate and therefore is not a simple creature of federal law. Although the filed rate doctrine provides a federal defense to the enforcement of this contract, *see* Section V, *infra*, Fax's state law breach of contract claim is not an artfully pleaded federal claim in disguise. *Cf. Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 813, 106 S.Ct. 3229, 3234, 92 L.Ed.2d 650 (1986) ("the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction"). Thus, to the extent that removal was based on the artful pleading doctrine, it was improper.

The district court therefore erred when it took jurisdiction over the case. And if Fax had objected to removal in the district court, we would vacate the judgment and remand with instructions to return the case to state court. However, where the plaintiff raised

no such objection, as in this case, "and the federal court enters judgment [on the merits], the issue in subsequent proceedings on appeal is not whether the case was properly removed," but whether the district court had jurisdiction "at the time it entered judgment.... [T]he validity of the removal procedure followed may not be raised for the first time on appeal." *Grubbs v. General Elec. Credit Corp.*, 405 U.S. 699, 700, 702, 92 S.Ct. 1344, 1347, 31 L.Ed.2d 612 (1972).

The case of *Mackay v. Uinta Dev. Co.*, 229 U.S. 173, 33 S.Ct. 638, 57 L.Ed. 1138 (1913) is instructive. In *Mackay*, a Wyoming corporation brought an action against a Utah citizen in Wyoming state court. There was no federal question on the face of the complaint, and the amount in controversy did not satisfy the diversity statute. Thus, the complaint could not have been filed in federal court. However, the defendant's amended answer asserted a counterclaim that raised a federal question and that sought damages exceeding the amount necessary for diversity jurisdiction. *Id.* at 174, 33 S.Ct. at 638–39. The defendant removed the case without objection by the plaintiff. *Id.* at 174–75, 33 S.Ct. at 638–39.

On appeal, the Supreme Court faced the question "whether, if irregularly removed, [the case] could be lawfully tried and determined." *Id.* at 176, 33 S.Ct. at 639. The Court answered in the affirmative:

"What took place in the state court may ... be disregarded by the court because it was waived by the parties, and regardless of ... how the attendance of the parties in the United States Court was secured, there was presented to the ... court a controversy between citizens of different states in which the amount claimed ... was more than [the jurisdictional amount]. As the court had jurisdiction of the subject-matter, the parties could have been realigned ... if that had been found proper."

*Id.*[6] Thus, while the parties could not confer jurisdiction by consent or waiver, "[r]emoval

---

**6.** It is not clear why the Court in *Mackay* discussed only diversity jurisdiction and not federal

question jurisdiction, since the defendant's answer and counterclaim raised questions of feder-

proceedings are in the nature of process" and failure of process may be waived. *Id.* When a party fails to object to an improper removal, "the court will not, of its own motion, inquire" into the propriety of· removal. *Id.* *See also Barbara,* 99 F.3d at 56 ("if a district court erroneously exercises removal jurisdiction over an action," appellate court should not remand a case to state court if the district court had jurisdiction at time of final judgment).

In the present case, AT&T's counterclaim plainly arose under federal law. AT&T's counterclaim sought to collect payments it was due under the tariff it filed· with the FCC, tariffs which it is required to collect pursuant to the FCA. *See American Tel. & Tel. Co. v. City of New York,* 83 F.3d 549, 552 (2d Cir.1996). As noted earlier, these tariffs are not simply contracts; they have the force of federal law. *Id. See also, Marcus,* 138 F.3d at 55–56; *Cahnmann v. Sprint Corp.,* 133 F.3d 484, 488–89 (7th Cir.1998); *MCI Telecomms. Corp. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1095 (3d Cir.1995); *MCI Telecomms. Corp. v. Garden State Inv. Corp.,* 981 F.2d 385, 387 (8th Cir.1992); *Carter v. American Tel. & Tel. Co.,* 365 F.2d 486, 496 (5th Cir.1966). Therefore, AT&T's counterclaim seeking to enforce the filed tariff provides a basis for federal question jurisdiction. *See Western Union Int'l Inc. v. Data Dev. Inc.,* 41 F.3d 1494, 1496 (11th Cir.1995); *cf. Louisville & Nashville R.R. v. Rice,* 247 U.S. 201, 202–03, 38 S.Ct. 429, 429–30, 62 L.Ed. 1071 (1918) (court has federal question jurisdiction over suit to recover payments pursuant to rate filed under Interstate Commerce Act, on which FCA is modeled);· *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983)(per curiam) (same); *Delaware and Hudson Ry. Co. v. Offset Paperback Mfrs., Inc.,* 126 F.3d 426, 427–28 (2d Cir.1997) (same). As in *Grubbs, Mackay* and *Barbara,* the district court ·below had jurisdiction over the dispute at the time it entered judgment. In the absence of an objection to removal in the district court, we will not disturb the district court's judgment based on the improper removal of the case from state court.

## V. *Filed Rate Doctrine*

■ Fax seeks, *inter alia,* a declaration that its agreement with AT&T to receive long-distance telephone service at the rates outlined in the January 14, 1994 unsigned letter is an enforceable and binding contract, as well as specific performance of that contract. In the alternative, Fax seeks compensatory and punitive damages for AT&T's breach of that contract. In either case, its demand is the same: Fax wants to pay the rate for which it allegedly contracted, rather than the rate on file with the FCC. AT&T argues, and. the district court found, that Fax's claims are barred by the filed rate doctrine. We agree.

■ The filed rate doctrine (also referred to· as the filed tariff doctrine) is the central principle of the regulatory scheme for interstate telecommunications carriers. It "forbids a regulated entity to charge rates for its ·services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). "[T]he [FCA] does not permit either a [customer's] ignorance or the carrier's misquotation of the applicable rate to serve as a defense to the collection of the filed rate." *Maislin Indus., U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 120, 110 S.Ct. 2759, 2763, 111 L.Ed.2d 94 (1990) (citations omitted). "Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier. and [customer]. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Keogh v. Chicago & Northwestern Ry. Co.,* 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922); *see also Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. ·494, 495, 59 L.Ed. 853 (1915). "Application of the filed rate doctrine in any particular case is not determined by the culpability of the ·defendant's conduct

al law. In any case, we see no principled reason for limiting the logic of *Mackay* to counterclaims

that create diversity jurisdiction.

or the possibility of inequitable results." *Marcus*, 138 F.3d at 58. All customers are "conclusively presumed" to have constructive knowledge of the filed tariff under which they receive service. *Kansas City Southern Ry. Co. v. Carl*, 227 U.S. 639, 653, 33 S.Ct. 391, 395, 57 L.Ed. 683 (1913); *accord Maxwell*, 237 U.S. at 98, 35 S.Ct. at 495–96; *Marcus*, 138 F.3d at 62–63; *Marco Supply Co. v. AT&T*, 875 F.2d 434, 436 (4th Cir. 1989).

There are two principles animating this strict enforcement of filed rates. First, the filed rate doctrine "prevent[s] carriers from engaging in price discrimination as between ratepayers (the 'nondiscrimination strand')." *Marcus*, 138 F.3d at 58. Unless filed rates are rigidly enforced, carriers might intentionally "misquote" rates to certain customers, contrary to the principles motivating the FCA. *See Maislin*, 497 U.S. at 127–28, 110 S.Ct. at 2766–67; 47 U.S.C. § 202(a). "[A]gents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored [customers], while other [customers] ... whose [business] is less important, would be compelled to pay the higher published rates." *Maislin*, 497 U.S. at 128, 110 S.Ct. at 2766 (internal quotation and citations omitted).

Second, the filed rate doctrine "preserv[es] the exclusive role of federal agencies in approving rates for telecommunications services that are 'reasonable' by keeping courts out of the rate-making process (the 'nonjusticiability strand'), a function that the federal regulatory agencies are more competent to perform." *Marcus*, 138 F.3d at 58 (citing *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19 (2d Cir.1994); *H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992)). *See also Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951) (reasonableness of rates is question for regulatory agency). The nonjusticiability strand

recognizes that "(1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set ... rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 45 F.3d 58, 62 (2d Cir.1995) (citation omitted).

On appeal, Fax recognizes, as it must, that we can not directly enforce the rates in the January 14 letter. *See* Appellant's Brief at 25 ("It cannot be said enough times that Fax does not seek to have the non-tariff rates enforced."). Those rates are not consistent with the CustomNet tariff pursuant to which Fax received service. If this court were to enforce the promised rate and award damages on that basis, we would effectively be setting and applying a rate apart from that judged reasonable by the FCC, in violation of the nonjusticiability strand of the filed rate doctrine. *See, e.g., Sun City*, 45 F.3d at 62; *Wegoland*, 27 F.3d at 21; *Taffet v. Southern Co.*, 967 F.2d 1483, 1494–95 (11th Cir.1992) (en banc); *Marco Supply*, 875 F.2d at 436. Moreover, an award of damages effectively would allow Fax to pay a lower rate than other CustomNet customers, in violation of the nondiscrimination strand of the filed rate doctrine. *See, e.g., Maislin*, 497 U.S. at 127–28, 110 S.Ct. at 2766–67; *Marcus*, 138 F.3d at 59–61; *Wegoland*, 27 F.3d at 19.

Fax attempts to recharacterize its argument in order to avoid the harsh inequities occasioned by application of the filed rate doctrine. Fax argues that, although an unfiled tariff may not be enforced, we may nonetheless enforce AT&T's *promise* to file the amended Conquest tariff as a contract tariff. Fax contends that it is not asking the court to consider the reasonableness of rates or to discriminate against non-plaintiff customers, but only to determine whether AT&T fraudulently induced Fax to become an AT&T customer by misrepresenting its intention to file a contract tariff.[7] Fax main-

---

7. On appeal, Fax also alleges that AT&T breached the covenant of good faith or fair dealing in its contract negotiations with Fax. *See* Appellant's Brief at 26. This argument was not raised in the district court, and we will not consider it for the first time on appeal. *See Chaiken v. VV Publ'g*

tains that this inquiry does not run afoul of the filed rate doctrine.

We are not persuaded by Fax's argument. Fax wants this court to enforce AT&T's promise to file the rate structure outlined in the January 14, 1994 letter as a contract tariff. This would be done retroactively, and Fax would get the benefit of the rates promised. But this is no different in effect than asking the court to enforce the January 14 rates directly. Despite Fax's attempt to re-characterize its claim, the relief it seeks would provide it with a discount over other CustomNet customers in violation of the non-discrimination strand of the filed rate doctrine. And in pressing its claims, Fax is asking this court to interfere inappropriately in the rate-making process in violation of the nonjusticiability strand. Fax may not indirectly accomplish that which it may not do directly.

■ Moreover, in light of the filed rate doctrine, we find that Fax has not adequately alleged claims for fraudulent misrepresentation or fraudulent inducement. In order to state a claim for fraudulent misrepresentation or fraudulent inducement, Fax must allege, *inter alia,* that it reasonably relied on false representations made by AT&T. *See, e.g., Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 310 (2d Cir.1994) (enumerating elements of common law fraud under New York law); *Village of Chatham v. Board of Fire Comm'rs,* 90 A.D.2d 860, 456 N.Y.S.2d 494, 495 (1982)(same for fraudulent misrepresentation); *Stone v. Schulz,* 231 A.D.2d 707, 647 N.Y.S.2d 822, 823 (1996)(same for fraudulent inducement); *Pinney v. Beckwith,* 202 A.D.2d 767, 608 N.Y.S.2d 738, 739 (1994)(same). Fax alleges that it relied on AT&T's oral promise to reimburse Fax retroactively for the difference between the rates for the CustomNet services Fax received and

the rates promised in the unsigned letter of January 14, 1994, as soon as AT&T filed those promised rates with the FCC.

We believe that, as a matter of law, Fax's reliance on this promise would not be reasonable. Fax's knowledge of the filed rate is conclusively presumed, and it would not be reasonable for Fax to rely on AT&T's promise to provide telephone service at any other rate. *See Marcus,* 138 F.3d at 62–63 (citing *Carl,* 227 U.S. at 653, 33 S.Ct. at 395)(customer's knowledge of filed rate is conclusively presumed and customer may not reasonably rely on promise to charge another rate); *accord Maislin,* 497 U.S. at 127–28, 110 S.Ct. at 2766–67; *Maxwell,* 237 U.S. at 97–98, 35 S.Ct. at 495–96; *Marco Supply,* 875 F.2d at 436. Indeed, as a factual matter, Fax admittedly was aware of the rates under the CustomNet tariff. Because Fax knew the CustomNet rates, and is presumed to have known of AT&T's obligation to charge those rates, we do not see how Fax could have reasonably relied on AT&T's promise to charge rates lower than the CustomNet rates through the subsequent use of retroactive rebates and credits. Put another way, given that knowledge of the filed rate is conclusively presumed, as a matter of law it would not be reasonable for Fax to rely on AT&T's promise to bill according to the rates in the letter of January 14, 1994 at the outset. Therefore, it was not reasonable for Fax to rely on AT&T's promise to accomplish the same end by billing at the CustomNet rates at the outset and later providing rebates and credits effective retroactively.[8] Because Fax cannot demonstrate reasonable reliance, dismissal of these claims was proper.

In conclusion, because Fax has not adequately alleged fraud on the part of AT&T,

Corp., 119 F.3d 1018, 1035 (2d Cir.1997); *Sandberg v. KPMG Peat Marwick, LLP,* 111 F.3d 331, 336–37 (2d Cir.1997).

8. Fax suggests that if it may not receive the rates promised in the January 14 letter, it should at least be billed pursuant to the filed Conquest tariff, which is less expensive than the CustomNet tariff. However, the record demonstrates that Fax knew that it was receiving CustomNet service, and that it knew Conquest service would

not be available until AT&T installed the T1 digital pipe. Although AT&T admits liability for failing to install the pipe, the filed rate doctrine mandates that Fax pay for the CustomNet service that it received. We need not consider the situation where, based on a carrier's false representations, a customer reasonably believes that it is receiving service under one filed tariff, when it is actually receiving service under another, more expensive, filed tariff.

the district court properly granted AT&T's motion for summary judgment dismissing these claims. In fact, any claim for damages by Fax based on AT&T's misrepresentations of its rates is barred by the filed rate doctrine, because an award of damages would lead to discrimination among AT&T customers and would improperly undermine the regulatory authority of the FCC. Finally, because the filed rate doctrine requires AT&T to charge rates and collect payments in accordance with the applicable filed tariff, the district court properly granted summary judgment for AT&T on its counterclaim seeking to collect those rates.

While the result we reach is mandated by the filed rate doctrine, that doctrine is plainly a creature of a different time. The Supreme Court has recognized that "although the filing requirement prevented price discrimination and unfair practices" when AT&T held a monopoly in long-distance telecommunications, strict application of the filed rate doctrine "frustrates those same goals" in today's era of deregulation and multiple competing carriers. *MCI Telecomms. Corp. v. American Tel. & Tel.,* 512 U.S. 218, 233, 114 S.Ct. 2223, 2232–33, 129 L.Ed.2d 182 (1994). The FCC itself has tried unsuccessfully to regulate the doctrine out of existence by excusing carriers other than AT&T from the FCA's filing requirements. *See id.* at 220–21, 234, 114 S.Ct. at 2226–27, 2233 (holding that the FCA exceeded its authority in exempting non-dominant carriers from filing requirement). In practice, as this case illustrates, the filed rate doctrine may lead to results that are quite unjust. But while "there is considerable debate ... about the wisdom of the filed rate doctrine," *id.* at 234, 114 S.Ct. at 2233 (internal quotation omitted), this court is not the proper forum in which to resolve the problem. Unless and until Congress or the Supreme Court re-examines the doctrine, we are bound to enforce it.

## CONCLUSION

The judgment of the district court is affirmed.