**In re WORLDCOM, INC., et al.,
Reorganized Debtors.**

No. 02–13533(AJG).

United States Bankruptcy Court,
S.D. New York.

March 25, 2005.

---

Weil, Gotshal & Manges LLP (Jason Billeck, Esq., James Grogan, Esq., of

counsel), Houston, TX, for the Reorganized Debtor.

Jenner & Block LLP (Jerome L. Epstein, Esq., Ian Heath Gershengorn, Esq., of counsel) Washington, D.C., Special Counsel to the Reorganized Debtor.

Akin, Gump, Strauss, Hauer & Feld (Daniel H. Golden, Esq., Ira S. Dizengoff, Esq., Kenneth A. Davis, Esq., of counsel), New York City, for the Official Committee of Unsecured Creditors.

Lowenstein Sandler PC (Michael S. Etkin, Esq., Bruce Buechler, Esq., of counsel), Roseland, NJ, Jackson Walker LLP (Ben C. Brooks, Esq., of counsel), Austin, TX, Doyle, Restrepo, Havin & Robbins LLP (Michael D. Robbins, Esq., of counsel), Houston, TX, for Telnet.

## MEMORANDUM DECISION REGARDING DEBTORS' MOTION TO DISMISS TELNET COMMUNICATIONS, INC.'S PROOF OF CLAIM NO. 8297

ARTHUR J. GONZALEZ, Bankruptcy Judge.

WorldCom, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, referred to as the "Debtors" herein at all times pre– and post-petition) objected to the proof of claim filed by Telnet Communications, Inc. ("Telnet"), Claim No. 8297. Claim No. 8297 relates to Telnet's purchase of billing software from the Debtors.[1]

### I. Jurisdiction and Venue

The Court has subject matter jurisdiction over this proceeding pursuant to sections 1334(b) and 157(a) of title 28 of the United States Code. This matter is a core proceeding within the meaning of section 157(b) of title 28 of the United States Code. Venue is properly before this Court, pursuant to sections 1408 and 1409 of title 28 of the United States Code.

### II. Background

The Debtors provide a broad range of communication services in over 200 countries on six continents. Through its core communications service business, which includes voice, data, internet and international services, the Debtors carry more data over its networks than any other entity. The Debtors were the second largest carrier of consumer and small business long distance telecommunications services in the United States, and provided a wide range of retail and wholesale communications services.

On July 21, 2002 and November 8, 2002, the Debtors commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On October 29, 2002, this Court entered an order establishing January 23, 2003, as the bar date for filing proofs of claim (the "Bar Date"). By entry of the Confirmation Order on October 31, 2003, this Court confirmed a plan of reorganization (the "Plan"). The Plan became effective on April 20, 2004 (the "Effective Date"). Upon the Effective Date, the Debtors' name was changed to MCI WorldCom Communications, Inc.

Telnet was a small start-up company that purchased telecommunications services from the Debtors for resale. On January 29, 1996, Telnet signed a Representation Agreement (the "Representation Agreement") with the Debtors. Pursuant

---

1. Telnet had also filed Claim No. 17421 on behalf of a putative class. This Court granted Telnet's request to defer ruling on the Debtors' Motion to Dismiss Telnet's Class Claim pending a ruling from the Fifth Circuit concerning the certification of the putative class. The Fifth Circuit held that Telnet did not meet the standards of Rule 23(b) of the Federal Rules of Civil Procedure, and that injunctive relief is unavailable to the putative class.

to the Representation Agreement, Telnet would receive a commission from the Debtors based upon a percentage of the billed telephone service usage of each customer that Telnet generated. In late February 1996, the relationship between Telnet and the Debtors expanded to enable Telnet to act as a re-biller of the Debtors' products and services.

To enable Telnet to re-bill its customers for long distance services provided by the Debtors, the Debtors required Telnet to sign "WorldCom's Commercial Application for Services" whereby Telnet committed to purchase $50,000 a month in long distance service over a three-year period. The idea behind the re-billing arrangement was for the Debtors to bill Telnet one rate for all of Telnet's customers' long distance use and then send Telnet a separate bill for each of Telnet's customers with Telnet's rate marked-up by a specific percentage set by Telnet on a customer-by-customer basis. That would enable Telnet to then send a bill to each of its customers at the marked-up rate. The difference in the two rates was to be Telnet's compensation, in lieu of receiving a commission under the Representation Agreement.

In February 1996, Telnet had signed up for a tariffed product known as "WorldOne Option G." The one-year period that Telnet purchased long distance services from the Debtors was governed by WorldCom FCC Tariff No. 2 (the "Tariff"). The Tariff included a clause which stated:

> [The Debtors] shall not be liable for any direct, indirect, consequential, special, actual or punitive damages, or for any lost profits of any kind or nature whatsoever arising out of any defects or any other cause. This warranty and these remedies are exclusive and in lieu of all other warranties or remedies, whether express, implied or statutory, including without limitation implied warranties of merchantability and fitness for a particular purpose.

The Tariff, Sec. B.5.6 (Aug. 16, 1995).

The Tariff provided for a software program package known as Call Manager PC, also referred to as PC Manager Rerate Software ("Call Manager Software"), which would enable Telnet to re-rate its customers' bills so that Telnet could send bills to its customers with marked-up re-rates. The Debtors' account executives gave Telnet brochures that explained that the Call Manager Software could facilitate the issuance of the re-rated bills necessary to enable Telnet to re-rate and re-bill its customers. The Call Manager Software was sold under the Tariff for $25. On March 29, 1996, the Debtors amended the Tariff to remove all mention of the Call Manager Software as one of its services. The relationship between the Debtors and Telnet ended in April 1997.

Telnet alleges that it was assured that its customers would receive accurate and detailed bills which would reflect calls made, time of day, originating source and an accurate rate or charge. Telnet maintains that, from the beginning, it and its customers complained that the monthly long distance telephone bills prepared by the Debtors were incorrect; that the rates charged were incorrect; and that customers were being billed for calls they did not place. Telnet claims that because of these problems it lost its clients, credibility, and reputation and as a result could not further market the Debtors' service. The Debtors allege, and Telnet does not deny, that Telnet engaged in self-help and withheld payments of thousands of dollars in outstanding invoices.

In 1998, Telnet filed suit in Texas state court, which was later removed to federal court, alleging that the Debtors misrepresented the reliability and accuracy of its billing services, failed to accurately bill

Telnet and Telnet's clients, and failed to provide bills with the "call detail" allegedly promised by the Debtors' representative. Telnet asserted state law claims for breach of contract, fraud, misrepresentation, negligent misrepresentation, negligence, gross negligence, tortious interference, violations of the Texas Deceptive Trade Practices Act (the "DTPA"), and violations of the Federal Communications Act (the "FCA"). Telnet further alleged that the Debtors tortiously interfered with Telnet's contractual relations with its customers in that the Debtors misrepresented to at least one customer (Inter Recycling) that the Debtors were representing Telnet in addition to themselves in offering services to that customer, however, Telnet was never compensated for such sale.

Telnet filed its individual proof of claim in this Court on January 2, 2003, attaching as support the Third Amended Complaint it filed in the Texas proceeding. The Debtors filed their objection on May 23, 2003. Thereafter, the Debtors filed the Motion to Dismiss Telnet's Individual Proof of Claim (the "Motion to Dismiss"). A hearing was held on January 13, 2004. This Memorandum Decision arises from the Motion to Dismiss.

### III. Discussion

The Debtors present three reasons why Telnet's claim cannot be allowed. First, the Debtors argue that the filed rate doctrine prohibits the enforcement of promises not incorporated within the Tariff. Second, the Debtors maintain that the limitation of liability clause in the Tariff is federal law which provides that consequential damages are not allowed. Finally, the Debtors urge that fraud or misrepresentation claims cannot be based on promises not in the Tariff because a plaintiff cannot show reasonable reliance on a promise not contained within the Tariff.

Dismissal pursuant to Federal Rule of Bankruptcy Procedure 7012 incorporates Rule 12(b)(6) of the Federal Rules of Civil Procedure. Under Rule 12(b)(6), dismissal is only appropriate if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Electronics Communications Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243 (2d Cir.1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). When ruling on a motion to dismiss, "the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 63 (2d Cir.1997) (citing *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)). Telnet's claims are for breach of contract, fraud, misrepresentation, violation of the Federal Communications Act, negligence, gross negligence, tortious interference with contact, and for violations of the DTPA.

The Court's task "in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984)). As a result, the fundamental issue at the dismissal stage "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Phelps v. Kapnolas*, 308 F.3d 180, 184–85 (2d Cir.2002) (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.

1998)). The Court now turns to assess the legal feasibility of Telnet's claims.

## A. The Filed Rate Doctrine

The filed rate doctrine prescribes that the "rights and liabilities defined by the Tariff cannot be varied or enlarged by either contract or tort of the carrier." *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 227, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (quoting *Keogh v. Chicago & Northwestern R. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922)). Further, it has been held that under this rule the tariff binds "both customers and carriers with the force of law." *ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 221 (2001) (quoting *Central Office* at 222, 118 S.Ct. 1956).

The filed rate doctrine is motivated by two principles (1) preventing carriers from engaging in price discrimination between ratepayers and (2) preserving the exclusive role of federal agencies in approving rates for telecommunications services that are "reasonable" by keeping courts out of the rate-making process. *Marcus v. Am. Tel. and Telegraph Corp.*, 138 F.3d 46, 58 (2d Cir.1998).

Telnet has conceded that it purchased a tariffed product. Therefore, the Debtors argue that all of Telnet's claims fail because they rely on representations not contained in the Tariff. The Debtors cite *Central Office* to demonstrate that Telnet's claims cannot proceed. In *Central Office* a reseller entered into a contract to sell a provider's services to the reseller's customers. The provider could not fill the volume of the reseller's customers and the reseller subsequently terminated the contract and filed a claim in state court. The Supreme Court held that the reseller's state law claims were preempted by the filed rate doctrine. With respect to Telnet's claims, the Debt-

ors note that the Tariff provides a specific remedy for damages arising in connection with the furnished services. The Debtors, therefore, argue that the only remedy available to Telnet is a per-minute credit for improperly billed minutes pursuant to the Tariff. The Debtors maintain that Telnet has not requested that form of relief and, therefore, no relief can be granted.

Telnet distinguishes *Central Office* on two grounds. First, Telnet states that the Supreme Court dismissed the contract claim in *Central Office* because it was based on a contract which was in direct conflict with the express terms of the tariff. Telnet also argues that because the FCC has abolished the requirement to file tariffs, the filed tariff doctrine is no longer applicable. However, in *Fax Telecomm., Inc. v. AT & T*, 138 F.3d 479 (2d Cir.1998), the court held that the FCC has unsuccessfully tried to regulate the doctrine out of existence by excusing carriers from filing rates and the court noted that, in practice the doctrine still applies. *Id.* at 491. The court in *Fax Telecomm.* also noted that the application of the filed rate doctrine may lead to unjust results, however, only Congress or the Supreme Court are the proper forums to re-examine this doctrine.

Telnet has not established that this Court can disregard *Central Office*. Even if there were support for the proposition that *Central Office* should not be followed with the same force and effect as before the FCC rule changes, this Court is bound by the Second Circuit decision of *Fax Telecomm.* which held that the filed rate doctrine still applies. Accordingly, this court is of the opinion that *Central Office* continues to be the seminal case regarding the filed rate doctrine.

The Supreme Court in *Central Office* stated that rates do not stand on their own and that they only have meaning when one knows the services that are to be provided for those rates. 524 U.S. at 223, 118 S.Ct. 1956. Further, the Supreme Court ruled, that any claim for inadequate services could also be presented as a claim for excessive rates and visa versa. *Id.* At least one court has found that it is unreasonable for a customer to rely on promises not contained within the tariff. *Fax Telecomm.*, 138 F.3d at 490. Although the Debtors did not specifically state that the software might not work, the limitation of liability clause clearly states it applies to any defect in service. The malfunction of the Call Manager Software is a defect in the service provided by the Debtors. Any promise by the Debtors to Telnet must be in the Tariff in order to govern. Here, the Debtors provided for remedies for defective service that will be discussed in greater detail further below, which Telnet has not pursued. Based upon the forgoing, the Court finds the Tariff controls and the filed rate doctrine applies.

## B. Enforceability of the Limitation of Liability Clause

 Having found that the Tariff controls and filed rate doctrine applies, the Court must now turn to the limitation of liability clause in the Tariff. Telnet alleges that the provision is overly broad, unreasonable and against public policy and, therefore, unenforceable as a matter of law. Telnet argues that the Debtors have included oppressive and overreaching provisions in their Tariff because tariffs can be filed with the FCC without review or scrutiny. Telnet maintains that courts, in general, have been suspicious of limitation of liability clauses and usually require a separate agreement in order to be enforceable. Further, the Debtors acknowledge, and the Court agrees, that regardless of the limitation of liability clause, the Debtors could be liable for damages in excess of the limitation of liability clause if they willfully violated an *express* term of the Tariff. Telnet contends that the Debtors' marketing and presentation of the Call Manager Software were willful misconduct in that the Debtors knew that the Call Manager Software did not function properly when they sold the product to Telnet. However, the Tariff disclaims any implied warranties and, further, there was no express warranty regarding the functionality of the Call Manager Software.

The Debtors maintain that Telnet failed to reference the section of the Tariff which outlined the available remedies under the Tariff and because Telnet has remedies available under the Tariff, the limitation of liability clause is not "unfair" on its face as Telnet suggests. Further, the Debtors argue that the only entity that can determine the "fairness" of a tariff provision is the FCC. The Tariff's provision regarding available damages states

> Except as otherwise provided in this Tariff, the liability of the Company for damages resulting in whole or in part from or arising in connection with the furnishing of service under this Tariff, including but not limited to mistakes, omissions, interruptions, delays, errors or other defects or misrepresentations shall not exceed an amount equal to five (5) times the initial minute charge provided for under this [T]ariff for the call for the period which the call was affected. No other liability in any event shall attach to the Company.

The Tariff, Sec. B.5.9 (Aug. 16, 1995).

 Under the filed rate doctrine of the FCA, courts and the FCC enforce liability limitation provisions in telecommunication tariffs. *See, e.g. ICOM Holding*, 238 F.3d at 222; *In re Richman Bros.*

Records, Inc. v. U.S. Sprint Communications, 10 F.C.C.R. 13639, ¶ 12, 1995 WL 733639 (1995); Katz v. MCI Telecomms., 14 F.Supp.2d 271, 275 (E.D.N.Y.1998) (enforcing a limitation of liability provision for third-party acts or omissions in MCI tariff). The Debtors argue, and Telnet does not refute, that there is no holding in any case under the FCA that a limitation on liability clause must appear in a separate contract between the parties to be enforceable.

■■■ As the court noted in Katz v. MCI Telecomms., an exception to the filed rate doctrine under a "willful misconduct" clause does not revive claims that are barred by the filed rate doctrine. Id. at 276; see also Marco Supply Co. v. AT & T, 875 F.2d 434, 436 (4th Cir.1989) (holding that willful misconduct does not except claims of misrepresentation from the filed rate doctrine); Int'l. Tel. Ctr., Inc. v. Am. Tel. & Tel. Co., 1997 U.S. Dist. LEXIS 14186, at *15, 1997 WL 599618, at *5 (E.D.La. Sept.16, 1997) (rejecting a defense of willful misconduct were plaintiff alleged that AT & T "purposefully" quoted a rate different from that in the filed tariff). Therefore, the terms of the Tariff are enforceable and bar the recovery that Telnet is seeking. The Court notes that Telnet has not sought damages as provided for under the Tariff. Further, the Court also notes that Telnet does not dispute that it has withheld payments due to the Debtors.

■■■ Finally, this Court is not the proper forum to determine the fairness of the terms of the Tariff; only the FCC can make such a determination. See Ambas-

sador, Inc. v. U.S., 325 U.S. 317, 324, 65 S.Ct. 1151, 89 L.Ed. 1637 (1945) (stating "where the claim of unlawfulness of a regulation is grounded in lack of reasonableness, the objection must be addressed to the [FCC] and not as an original matter brought to the court"); Total Telecomm. Servs., Inc. v. Am. Tel. & Tel. Co., 919 F.Supp. 472, 480 (D.D.C.1996) (finding "The FCC has primary jurisdiction over claims that tariffs and/or practices are not just or reasonable."); Fax Telecomm. v. AT & T, 952 F.Supp. 946, 951 (S.D.N.Y. 1996) (holding "the Supreme Court has long-held that the reasonableness of rates in a regulated industry is a question solely for the governing regulatory body."), aff'd, 138 F.3d 479 (2d Cir.1998). This is the nonjusticiability strand of the filed rate doctrine. Fax Telecomm. v. AT & T, 138 F.3d 479, 489 (2d Cir.1998).

As noted earlier, the application of the filed rate doctrine sometimes leads to harsh consequences. The application of the principles set forth in Fax Telecomm. and Central Office may result in the ability of a service provider to use a tariff to protect it from liability based upon statements that may have been made but not set forth in the Tariff. Here, there were no representations of any implied warranties in the Tariff and therefore, an action in fraud cannot be based on the present facts. Further, neither party has argued that the FCC has promulgated any regulation that limits a party's ability to waive implied warranties in a tariff.[2] It is not within this Court's province to determine the fairness or equity of applying the filed rate doctrine. To the extent that the Debtors did not know that the Call Manager

---

2. The U.C.C. provides an illustration of the ability to waive implied warranties. Although the ability and requirements to waive such warranties vary from state to state, they are nevertheless freely waivable absent restrictions set by the particular state's statutes.

In this case, the Court is presented with sophisticated parties who presumably have knowledge, experience, and expertise in the telecommunications field and as such should understand the weight placed on the language of the filed Tariff.

Software was not functional at the time of the initiation of the Rebilling Agreement, Telnet is only entitled to damages pursuant to the terms of the Tariff.[3] Any challenges regarding the "fairness" of applying the filed rate must be brought to the FCC.

## C. Fraud and Misrepresentation

 Telnet alleges that the Debtors induced them into the contract due to fraudulent misrepresentations. The Debtors argue and the Court agrees that such actions are barred by the filed rate doctrine unless there was a fraudulent misrepresentation in direct conflict with the terms of the Tariff. As discussed above, the Tariff disclaims any implied warranties and, therefore, the Debtors' conduct would not be a willful violation of the explicit terms of the Tariff. The Second Circuit in *Fax Telecomm.* was confronted with a claim alleging that AT & T induced the plaintiff-buyer to purchase long-distance telephone services after it allegedly promised to file a new contract tariff with the FCC. AT & T never filed the contract tariff and charged the plaintiff the higher rate of the filed tariff. The court held that because the terms of AT & T's promise were not within the Tariff, the plaintiff could not reasonably rely on such promises and, therefore, could not establish fraudulent misrepresentation.

Although the Tariff promises to provide the Call Manager Software, nowhere in the Tariff does it warrant the reliability of the software. However it does provide remedies for any failure of the software. Further, the Tariff's limitation of liability clause explicitly states that

> "This warranty and **these remedies are exclusive and in lieu of all other warranties** or remedies, **whether express,**

**implied** or statutory, including without limitation implied warranties of merchantability and fitness for a particular purpose."

The Tariff, Sec. B.5.6 (Aug. 16, 1995) (emphasis added).

This clause disclaims any express or implied warranties and further states that the remedies within the Tariff are the exclusive ones for any service defects. The fact that the Call Manager Software did not operate as expected is clearly a defect in the services provided by the Debtors. Further, to the extent that Telnet alleges it relied on any implied warranty, regarding the Call Manager Software, such reliance was not "reasonable" as discussed in similar context in *Fax Telecomm.* because of the Tariff's explicit disclaimer concerning the available remedies and warranties.

This Court is bound by the decision of *Fax Telecomm.* which involved a case of explicit misrepresentations which still applied the filed rate doctrine in limiting the plaintiff's remedies to those provided for in the Tariff. Further, the facts alleged herein are similar to those in *Central Office* which also held that the filed rate doctrine barred such claims. Telnet attempts to distinguish *Central Office* by arguing that the defendant in *Central Office* had included an explicit provision in its tariff that stated that it made no warranties as to the performance of the software. However, Telnet fails to acknowledge that the Debtors have essentially included the same disclaimer in the Tariff in the limitation of liability clause. The failure of the Call Manager Software to function properly is clearly a defect in the Debtors' service and, therefore, Telnet is only entitled

---

**3.** The Court also notes that Telnet is seeking "at least $16 million" in damages for the failure of a $25 software program. In such a context, the Debtors' limitation of liability appears to be reasonable.

to the remedies available in the Tariff. If this Court were to rule that the Debtors engaged in a fraudulent misrepresentation it would have to conclude that there was either an express or implied warranty in the Tariff which was misrepresented. An examination of the Tariff reveals that this is simply not the case.

 "Application of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results." *Marcus,* 138 F.3d at 58. This Court is bound by the filed rate doctrine even if it may lead to an inequitable result. The purpose of the filed rate doctrine is to keep the courts out of the ratemaking process and, as stated above, Telnet's only remedy outside of those in the Tariff is to argue the "fairness" of the Tariff's provisions in front of the FCC. Based upon the foregoing, any claims by Telnet for damages resulting from the malfunction of the Call Manager Software are dismissed; likewise, Telnet's claims based on the Debtors' alleged willful misconduct are also dismissed.

### D. Telnet's Tortious Interference Claim

 Telnet's tortious interference claim is separate from Telnet's claim for inaccurate billing practices. Telnet alleges that the Debtors, in at least one instance, misrepresented to customers that they represented Telnet in addition to themselves. Telnet further alleges that the Debtors never gave Telnet any compensation for contracts, which arose in this manner. In other words, Telnet contends that the Debtors improperly converted Telnet's customers to the Debtors' customers through fraud and deceit. Telnet alleges that

[The Debtors have] tortiously interfered with the contractual relationships of Tel-net with various customers resulting in the loss of those customers to [the Debtors]. [The Debtors] acted with malice, and it is therefore liable to Telnet not only for its actual damages as a result of such tortious interference but also for punitive damages.

Third Amend. Comp. ¶ 111.

The alleged transactions were not derivative of any phone services to be provided by the Debtors and is therefore, not governed by the Tariff. *Access Telecom, Inc. v. MCI Telcomms. Corp.,* 197 F.3d 694, 711 (5th Cir.1999) (distinguishing the claims of tortious interference from those in *Central Office* because they were not derivative of a contract claim and concerned illegal actions outside the scope of the tariff). The cause of action for tortious interference, as set forth in its Third Amended Complaint, is one for tortious interference with contract.

 As the Debtors correctly point out, tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party. *Holloway v. Skinner,* 898 S.W.2d 793, 796 (Tex.1995). Telnet, in not responding to the Debtors' legal argument and in not pleading the existence of any valid contract between themselves and a third party with which the Debtors interfered, has failed to state a cause of action for which relief could be granted. Therefore, Telnet's tortious interference claim is dismissed.

 Telnet, in the alternative, has requested that the Court permit it to replead its complaint in order to cure any defects as determined by this Court. However, Telnet has amended its complaint three times. As considered above, Telnet failed to respond to the defects raised by the Debtors regarding its tortious interference with contract claim in its opposition to the Motion to Dismiss. Based upon the fore-

going, the Court finds that providing Telnet an additional opportunity to amend its complaint is not warranted. Therefore, Telnet's request to replead its complaint is denied.

## IV. Conclusion

Based on the foregoing, the Court finds that the Tariff controls and the filed rate doctrine applies to any claims arising out of the alleged defective service; accordingly, such claims are dismissed. Any challenges by Telnet about the equity or fairness of the limitation of liability clause must be brought before the FCC. As a matter of law, Telnet's fraud and misrepresentation claims cannot be sustained because it cannot establish reasonable reliance based on any terms not contained within the Tariff. Regarding Telnet's tortious interference claim, Telnet has failed to state a cause of action and it is, therefore, dismissed. Further, Telnet request to amend its complaint to cure any defects in its pleadings is denied. The Motion to Dismiss Telnet's Individual Proof of Claim is granted in full.

The Debtors are to settle an order consistent with this Memorandum Decision.