### INDECK MAINE ENERGY, L.L.C., Plaintiff,

v.

### ISO NEW ENGLAND INC., Defendant.

#### No. 00–978–RRM.

United States District Court, D. Delaware.

Oct. 9, 2001.

---

Richard D. Allen, Esquire, and Christo-
pher F. Carlton, Esquire, Morris, Nichols,

Arsht & Tunnell, Wilmington, Delaware; Larry F. Eisenstat, Esquire, Geoffrey Bestor, Esquire, Michael R. Engleman, Esquire, and Susan A. Littell, Esquire, Dickstein Shapiro Morin & Oshinsky LLP, Washington, D.C., counsel for plaintiff Indeck Maine Energy, L.L.C.

W. Harding Drane, Jr., Esquire, and Richard L. Horwitz, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Leslie E. John, Esquire, Charles S. Hirsch, Esquire, and Stacy L. Broad, Esquire, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania; Kathleen A. Carrigan, Esquire, ISO New England, Inc., Holyoke, Massachusetts, counsel for defendant ISO New England Inc.

## OPINION

McKELVIE, District Judge.

This is a utilities case. Plaintiff Indeck Maine Energy, L.L.C. (Indeck) is an Illinois limited liability company comprised of two member companies. One of those member companies is a Delaware limited liability company that is itself controlled by two Delaware business trusts. Indeck's other member company is a Indeck Energy, Inc., an Illinois corporation. Indeck owns and operates two electric power plants in Maine that are the subject of this litigation. The two power plants are managed by Ridgewood Power Management LLC. Defendant ISO New England Inc. (ISO–NE) is a Delaware corporation with its principal place of business in Holyoke, Massachusetts. ISO–NE was created by the New England Power Pool (NEPOOL), an organization of generators and transmitters of energy in New England, to administer the region's energy markets. The Federal Energy Regulatory Commission (FERC) approved ISO–NE's creation and means of operation.

Indeck filed this action in the Superior Court of the State of Delaware for New Castle County on October 24, 2000. It alleges that ISO–NE breached a contract between the two for the provision of energy at various times in October 1999. The complaint also contains related claims for breach of an implied contract, promissory estoppel, fraud, and willful misconduct in violation of the Massachusetts Consumer Protection Statute, Mass. Gen. Laws ch. 93A, §§ 1–11. Indeck seeks to recover payment for the energy it provided to NEPOOL in October 1999 at the price and quantity contained in a bid it submitted to ISO–NE. ISO–NE seeks to mitigate Indeck's bid pursuant to the FERC-approved market rules by which it administers the NEPOOL energy markets.

ISO–NE removed the action to this court on November 21, 2000, claiming that this court has subject matter jurisdiction because Indeck's suit challenges the NEPOOL market rules. Because ISO–NE asserts that these market rules are a federally approved tariff, it asserts that the court has federal subject matter jurisdiction. 28 U.S.C. § 1441(b). ISO–NE then filed a motion to dismiss on November 29, 2000. Indeck opposed the motion to dismiss and also filed a motion to remand the case to the Superior Court on January 2, 2001. The court heard oral argument on March 22, 2001. This is the court's ruling on both motions.

## I. *FACTUAL BACKGROUND*

■ The following facts are taken from Indeck's complaint and the various affidavits and documents filed in support of, or in opposition to, the parties' motions. While the court will consider certain documents, including public filings with FERC and contracts governing the operation of ISO–NE, in addressing the motions, the consideration of these documents will not convert ISO–NE's motion to dismiss into a motion for summary judgment because the

documents are integral to Indeck's claims. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997) (holding that a court may consider documents other than a complaint without converting a motion to dismiss to one for summary judgment if those documents are integral to the plaintiff's claims).

### A. *The Organization of the New England Energy Market*

Indeck is a generator of electrical power and operates two power plants in Maine, the Jonesboro unit and the West Enfield unit. Both power units are small, wood burning, steam generators. Indeck uses the units to provide power to NEPOOL, an organization of 150 participants, including Indeck, that generate and transmit bulk electric power to regions of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island and Connecticut.

The complaint alleges that in 1997, NEPOOL sought and received the approval of FERC to create an independent system operator (ISO), now known as ISO–NE, to administer the wholesale energy markets for the area covered by NEPOOL. On May 1, 1999, ISO–NE began administering these markets.

ISO–NE has provided the court with additional details about the creation of ISO–NE and its administration of the energy markets. These facts are contained in various public documents, including FERC orders and various filings with FERC. As one of those documents explains, "[t]he ISO's primary responsibilities are to ensure system reliability, administer the NEPOOL Tariff, and oversee the efficient and competitive functioning of the regional power market." *New England Power Pool*, 85 FERC ¶ 61,379, 1998

WL 881297 (1998). The NEPOOL Tariff is a series of FERC-approved energy rates. It is incorporated into the Restated New England Power Pool Agreement (the "RNA"), which is an agreement among NEPOOL participants that sets forth "Market Rules" governing the provision and pricing of electric power in New England. The RNA and its Market Rules have also been approved by FERC in a series of rulings beginning with *New England Power Pool*, 85 FERC ¶ 61,379, 1998 WL 881297 (1998), pursuant to the requirements of § 205 of the Federal Power Act, 16 U.S.C. § 824d. The Market Rules govern ISO–NE's administration of the energy markets it administers. Section 7.1 of the agreement between ISO–NE and NEPOOL, known as the "Interim ISO Agreement," provides that all NEPOOL participants, including Indeck, agree to operate their facilities in accordance with ISO's direction under the Market Rules. The Interim ISO Agreement also has been approved by FERC.

Indeck's complaint discusses at length the operation of the spot market for energy. The spot market is one of the energy markets administered by ISO–NE.[1] It is competitive bidding market among generators for the provision of energy. Pursuant to Market Rules in the spot market, each NEPOOL participant must bid each day on the provision of power for the next day, referred to as the "dispatch day." Bids are comprised of the price of energy and certain related information on the production parameters of each generator, including the minimum run time, start-up time, and the maximum and minimum quantities of energy (known as the "High Operating Limit" and "Low Operating Limit") that can be produced each hour in megawatts.

---

**1.** The remaining markets are for reserve electrical power. They are the markets for Ten–Minute Spinning Reserve, Automatic Generator Control, Ten Minute Non–Spinning Reserve and Thirty Minute Operating Reserve. Indeck does not claim that any of these other markets are relevant to this action.

Pursuant to the market rules, ISO–NE then sorts the bids into economic order based upon price. It then reviews the estimates of the energy demand needed for the dispatch day and schedules the generators who can provide the energy at the least cost in accordance with the range of bids. This process is called "dispatching."

ISO–NE explains that the administration of the spot market for energy discussed in Indeck's complaint is conducted pursuant to Market Rule 5, and that the price at which the supply of energy bid meets the estimated demand is known as the Energy Clearing Price ("ECP"). According to ISO–NE, Market Rule 5 does not provide for it to contract for the purchase or supply of energy. Rather, ISO–NE administers the markets for the buyers and sellers, establishes the prices for energy, and provides for settlement of obligations in its markets. Furthermore, Rule 5 does not permit ISO–NE to compensate generators for their start-up costs. While it describes the spot market for energy at some length in its complaint, Indeck alleges that the "disputes complained of in this complaint do not result from ISO–NE's day-ahead dispatch."

In its briefing and submissions to the court, ISO–NE relies on another Market Rule by which it administers the energy markets—Market Rule 17. Rule 17 provides mechanisms for the provision of energy at times when one NEPOOL participant may have market power and can therefore unilaterally affect the ECP. The Rule requires ISO–NE to monitor the efficiency of the energy markets under the Interim ISO Agreement. When one NEPOOL participant has market power over the ECP, the bidding is said to be "out of economic merit order." For example, during transmission line repair or other transmission constraints, Rule 17 requires ISO–NE to dispatch energy out of economic merit order, although the price of doing so may exceed the ECP. ISO–NE then mitigates the bid prices for that energy by means of various formulae provided in the Rule. The amount by which the mitigated price exceeds the ECP is known as "uplift."

ISO–NE submits that Market Rule 17 governs the pricing of all dispatching of units run out of economic merit order; that is, it governs at all times when the scheduling of power without regard to the ECP is necessary. Market Rule 17 contains several pricing methods for mitigating the bids of units run out of merit order. Section B of the Rule provides that when ISO–NE has identified a particular resource as having market power, it will mitigate the resource's bids by using various pre-established pricing screens. The particular price screen used depends on whether the resource is regularly or rarely run out of economic merit order. For those resources seldom run out of merit order, Section B.2.b. provides that either certain default price screens will mitigate energy prices or, alternatively, the parties can contract for the provision of energy on other terms. That subsection of Rule 17 states the following:

The ISO may determine that some of these resources should be entitled to receive a very high bid price or have a special contractual arrangement to sure their availability when need to support system reliability and security. Normally such arrangements will be negotiated prospectively. The price screen for resources that seldom run in economic merit order is designed to create a powerful incentive for such generators to come forward and negotiate an appropriate contract with the ISO. The price screen itself is a default case designed to ensure that the ISO has sufficient bargaining leverage in such negotiations. Until the resource owner and the ISO

reach agreement, the default price screen will enable the resource to be paid for running in the short term, while providing a strong incentive to negotiate an appropriate arrangement with the ISO (or another willing buyer) as the screen price rapidly and progressively drops to just 5% above the same-hour [ECP] in the unconstrained market. John Decl., Ex. E, Market Rule 17 § B.2.b. Thus, Rule 17's price screens serve as an incentive for NEPOOL participants to enter agreements at mutually acceptable term with ISO–NE.

Rule 17 also provides for an alternative dispute resolution mechanism for NEPOOL participants who object to a mitigation remedy imposed by ISO–NE. Part IV of Rule 17 provides that participants may seek ADR review as soon as ISO–NE informs the participant that its bids will be subject to mitigation. The Rule goes on to detail the procedures for ADR review and provides that its results will be "binding" and are subject to appeal to FERC. The ADR remedy provided in Part IV is not the exclusive means by which participants can challenge mitigation remedies however-er. The Rule also provides in § F.8 that "[a] Participant may appeal the imposition of a mitigation remedy to the FERC whether or not it has requested an ADR process." FERC and ADR are the only remedies available to the participant to challenge mitigation. "Except for this ADR process, a Participant may not seek removal of the mitigation, or any other remedy against the ISO, in any forum other than the FERC, and may not contest the decision of an ADR Neutral in any forum."

### B. *The October 1999 Transactions*

Indeck alleges that ISO–NE breached agreements for the supply of electrical energy during October 1999. Specifically, Indeck alleges that two contracts existed between Indeck and ISO–NE to provide energy. The first alleged contract was for Indeck to produce energy during transmission constraints on October 16 and 17, 1999. The second alleged contract was for Indeck to produce energy on October 21, 23 and 26, 1999. With respect to each contract, Indeck has also brought claims under theories of breach of implied contract and promissory estoppel. Indeck also alleges fraud and breach of the Massachusetts Consumer Protection Statute, Mass. Gen. Laws ch. 93A, §§ 1–11.

### 1. October 16–17, 1999

Indeck alleges that by September 1999 it had several disputes with ISO–NE regarding ISO–NE's interpretation of the Market Rules and wanted to avoid further disputes by not being dispatched by ISO–NE. Indeck was required by the Market Rules, however, to submit daily bids for energy. Thus, on September 30, 1999, it submitted a bid for energy at $9,999 per Megawatt hour ("Mwh"). This bid was the highest that could be submitted on ISO–NE's computer bidding system. Indeck did not bid on subsequent days and thus, under the Market Rules, the $9,999 per Mwh bid became Indeck's standing bid for energy. Indeck intended its high bid to simultaneously fulfill its commitment to bid on energy while enabling it to avoid being dispatched in merit order.

On October 4, 2001, Indeck asserts that it received a telephone call from the Bangor Hydro–Electric Company. Bangor Hydro is the local area control operator and transmits ISO–NE's dispatch instructions for Indeck's region. Bangor Hydro informed Indeck that both of Indeck's units were requested to run for 37 hours on October 16 and 17 at their Low Operating Limit.

Indeck alleges that its management at Ridgewood thought the dispatch request to be out of the ordinary because they re-

ceived it two weeks prior to the dispatch date and because Indeck's standing bid was $9,999 per Mwh. Following the dispatch request, William P. Short, III, Director of Power Marketing for Ridgewood, called Rick Milardo, an ISO–NE load forecaster, to confirm the price and terms of the dispatch. Milardo confirmed that ISO–NE was aware of Indeck's bid terms and that an ISO–NE review committee decided to accept Indeck's bid. On October 6, 1999, Short again confirmed with Milardo ISO–NE's dispatch order.

On October 7, 1999, Short sent a memorandum by facsimile to Milardo and Marty Amati, Vice President of Operations for ISO–NE, that confirmed Short's understanding of ISO–NE's dispatch order and contained a nineteen page copy of Indeck's standing bid.[2] On October 15, 1997, the day before the scheduled dispatch, Short sent a similar memorandum, again with Indeck's bid attached, to Milardo and various other officials at ISO–NE.

On October 16, 1997, the dispatch date, Indeck ran both units at their Low Operating Limits. One hour into the expected operating time, ISO–NE requested the units be operated at their High Operating Limits. Later that day, ISO–NE requested the units be returned to the Low Operating Limits and at 3 p.m. that afternoon directed Indeck to shut down the units. This termination order was well before the complete run time of 37 hours Indeck alleges to be a term of the contract. During its run time, the Jonesboro unit generated only 113.7 Mwh and the West Enfield unit generated 105.5 Mwh. Had the complete 37 hour run taken place, each plant would have produced 370 Mwh.

The ISO–NE Settlements Department sent a report to Indeck on October 16, 1999, indicating that Indeck would be compensated at its bid price of $9,999 per Mwh. Yet on October 25, 1999, Donald Bourcier, Manager of Market Monitoring and Mitigation for ISO–NE, orally informed Short that ISO–NE intended to disregard the bid price and would instead mitigate the Indeck's bid for October 16–17, 1999 pursuant to Market Rule 17.

Over the next several months, the parties continued to dispute whether Indeck was entitled to its unmitigated bid price of $9,999 per Mwh or whether some lower price should be substituted pursuant to Market Rule 17. In its complaint, Indeck alleges that Bourcier, ISO–NE's Manager of Market Monitoring and Mitigation, orally informed Indeck representatives on November 12, 1999 that ISO–NE intended to mitigate retroactively Indeck's bid. In response to ISO–NE's mitigation, Indeck states that it placed its units on economic outage on December 13, 1999.[3] Under Market Rule 13, economic outage

2. The relevant portion of that memorandum states the following:

> Per the ISO–New England's oral acceptance of Indeck Maine Energy ("Indeck") posted electronic bids, including resource characteristics, for its West Enfield and Jonesboro power plants, I want to inform you in writing that Indeck will operate, unless physically not capable of operation, both its West Enfield and Jonesboro power plants on October 16 through October 17, 1999. A copy of the Indeck bids, including resource characteristics, as of Monday, October 4, 1999, is attached to this memorandum.

> . . . .
> By the end of this week, I hope that we will have worked out any uncertainty that may underlie the ISO–NE's acceptance of Indeck's posted electronic bids for its West Enfield and Jonesboro power plants.

3. Indeck's complaint actually states that it put its units on economic outage on December 13, 2000. Complaint at ¶ 22. Given its context and the later references to the units on economic outage in March 2000, the court assumes the year to be a scrivner's error.

is permitted when a unit operator does not expect NEPOOL revenues to justify operation. Although on economic outage, Indeck states that ISO–NE sent it a letter dated March 3, 2000 stating that Indeck's future bids would be capped under Market Rule 17 at $301.92 per Mwh for the Jonesboro unit and $301.73 per Mwh for the West Enfield unit.

Indeck further alleges that ISO–NE later offered a price of $1,000 per Mwh to Indeck during a period of high demand experienced in New England on May 8 and 9, 2000. According to Indeck, that offer was made despite the March 3, 2000 mitigation letter and was conditioned upon Indeck's acceptance of the price of $1,000 per Mwh for the unresolved claims dating back to October 16 and 17, 1999. Indeck rejected the offer and did not provide power during the May 8–9 shortage.

ISO–NE made another attempt to resolve the October 16–17 dispute in a letter dated May 22, 2000. In that letter, ISO–NE revised the bid cap for Indeck's units to $820.68 per Mwh and stated that the price would be applicable to the October 16–17, 1999 period.

On June 22, 2000, Indeck filed a complaint with FERC to challenge ISO–NE's imposition of a bid cap on it starting on March 3, 2000. On July 26, 2000, FERC issued an order finding that the bid caps were improper. FERC concluded that Indeck did not exercise market power and thus its bidding of $9,999.99 per Mwh did not affect conditions in the energy market sufficiently to require the remedy of a bid cap.

According to Indeck, it has not been paid for its provision of power on October 16–17, 1999. It requests compensatory damages for ISO–NE's failure to honor the price of $9,999 per Mwh and other terms of the contract. The compensatory damage estimate is $5,151,000, plus interest, for the period of October 16–17, 1999.

Indeck also seeks double or treble damages and reasonable attorney's fees under the Massachusetts Consumer Protection Statute.

### 2. October 21, 23, and 26, 1999

Indeck alleges that on three additional occasions in October 1999 ISO–NE requested Indeck to start its units and synchronize its power output with that of the power grid in the upcoming days. The requests were allegedly made on October 20 for October 21, October 21 for October 23, and October 25 for October 26. Indeck asserts that each time it began start-up procedures for both units and that each time ISO–NE cancelled the dispatch order before Indeck could synchronize. On two of the occasions the units were within minutes of synchronization when cancelled. Indeck alleges ISO–NE knew of its $9,999 per Mwh bid each time and acknowledged that Indeck would receive that price. According to Indeck, ISO–NE refused to pay Indeck for the requested operation of its · units on all three occasions.

Indeck requests compensatory damages in the amount of its bids for the October 21, 23, and 26, 1999 period. On the claim for promissory estoppel, Indeck's request for damages is limited to the damages it incurred preparing to run its units in reliance on ISO–NE's instructions.

## II. DISCUSSION

### A. Should this Action be Remanded to State Court?

ISO–NE sought removal of Indeck's suit from state court pursuant to 28 U.S.C. § 1441(b). The removal of an action from state court is only permissible for "actions that originally could have been filed in federal court." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Section 1441(b) provides that "[a]ny civil action of

which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties." Removal is thus permitted under § 1441(b) for cases "arising under" federal law to the same extent as provided in 28 U.S.C. § 1331. *See Wisconsin Dep't of Corrections v. Schacht,* 524 U.S. 381, 386, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998); 14B Wright, Miller & Cooper, Federal Practice and Procedure § 3722 at 385 (3d ed.1998). Thus, ISO–NE must establish that this court has federal question jurisdiction.

■■■■ "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar,* 482 U.S. at 392, 107 S.Ct. 2425. The well-pleaded complaint rule guarantees that the plaintiff is the master of his complaint by focusing on the plaintiff's cause of action. "For better or worse, under the present statutory scheme as it has existed since 1887, a defendant may not remove a case to federal court unless the plaintiff's *complaint* establishes that the case 'arises under' federal law." *Franchise Tax Bd. of the State of California v. Constr. Laborers Vacation Trust for S. California,* 463 U.S. 1, 10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (emphasis in original). If the plaintiff has asserted only state law claims, even though he could have asserted federal claims, there is no federal question jurisdiction. *Id.* Similarly, when the plaintiff has asserted only state law claims but has anticipated a federal defense, there is no federal question jurisdiction. *Gully v. First Nat. Bank in Meridian,* 299 U.S. 109, 113, 57 S.Ct. 96, 81 L.Ed. 70 (1936). Thus, the court must determine what claims are pleaded by Indeck in its complaint and whether, under the well-pleaded complaint rule, those claims create federal question jurisdiction.

Indeck argues that its complaint alleges solely state causes of action. While it admits that the complaint discusses the various market rules applicable to NE-POOL members, it points out that the complaint specifically disclaims that it challenges those rules. For example, after discussing the spot market for energy in Paragraph Eight, it states that the "disputes complained of in this complaint do not result from ISO–NE's day-ahead dispatch." Thus, no federal cause of action appears on the face of Indeck's complaint.

Instead, Indeck alleges that its claims are based on state contract law. For the October 16–17 claims, Indeck alleges a contract was created by Indeck's offer to provide energy at its "posted Energy bid price of $9,999 per Mwh for a Minimum Run Time of twenty-four hours and a Low Operating Limit of 10Mwh." Complaint at ¶ 34. Similarly, Indeck's other claims, including an implied contract and promissory estoppel assert that ISO–NE's obligation is based in Indeck's "posted bid price" or "standing bid." Complaint at ¶ 44, 51. Indeck's claims resulting from the dispatch orders of late October are no different. They too allege the existence of an express contract, implied contract or promissory estoppel obligation based on Indeck's posted bid. Complaint at ¶ 65, 70, 78. Thus, with the exception of Indeck's claim under the Massachusetts Consumer Protection Statute, all of Indeck's claims for relief are based on its assertion that an agreement existed between it and ISO–NE and that the terms of that obligation were set by the bid parameters set forth by Indeck.

ISO–NE argues that no contract can exist between it and Indeck because it is not permitted to enter contracts to purchase energy. Indeck rebuts this argu-

ment by pointing to Market Rule 17, Part II.B.2.b., which permits ISO–NE to contract with NEPOOL participants to provide energy during transmission constraints at prices other than the default mitigated price. Yet in its briefing to the court, Indeck specifically denies that its claims are brought to challenge the mitigation provisions of Rule 17. Indeed, if it had directly challenged Market Rule 17, that Rule's ADR provisions would bar review of such a contract in a forum other than ADR or FERC. Instead, Indeck argues that Market Rule 17's contract provisions establish that ISO–NE had the authority to separately contract for the provision of énergy and argues that its alleged contract is simply another species of contract into which ISO–NE can enter.

In response, ISO–NE argues that all it did was mitigate ISO–NE's bid price pursuant to the price screens in Rule 17 and that Indeck's challenge is really to the Market Rules. As a challenge to the Market Rules, or ISO–NE's interpretations of that rule, Indeck's challenge is completely preempted from state court adjudication and instead must be brought before FERC because it is, in actuality, a challenged to a federally approved tariff.

■ Because Indeck's complaint contains only state claims, ISO–NE asserts that federal jurisdiction is appropriate pursuant to two exceptions to the well-pleaded complaint rule. The first exception, complete preemption, is regarded as an "independent corollary" of the well-pleaded complaint rule. *Franchise Tax Bd.*, 463 U.S. at 22, 103 S.Ct. 2841. It provides that claims that are completely preempted by federal law must be removed to federal court. *Id.* at 24, 103 S.Ct. 2841. The second exception is known as the "artful pleading doctrine." The artful pleading doctrine provides that a plaintiff should not be able to "frustrate a defendant's right of removal by carefully pleading the

case without reference to any federal law." 14B Wright, Miller & Cooper, Federal Practice and Procedure § 3722 at 436 (3d ed.1998).

■ The artful pleading doctrine and complete preemption are frequently intertwined because a complaint setting forth state law claims that are completely preempted must be removed to federal court regardless of the characterization of the claims in the complaint. *See Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998)("The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim."). Indeck argues, however, that because the two doctrines are intertwined, their "analysis is the same." *See Goepel v. Nat'l Postal Mail Handlers Union*, 36 F.3d 306, 310 n. 5 (3d Cir.1994) (describing the artful pleading doctrine and complete preemption as the "same principle"). This conclusion takes the relationship between the doctrines too far. Analysis of the two doctrines is not the same. The Third Circuit has analyzed them separately, *see, e.g., United Jersey Banks v. Parell*, 783 F.2d 360, 367 (3d Cir.1986), and the few courts which have held the doctrines to be coextensive have been criticized as "hardly ... very well established." *See* 14B Wright, Miller & Cooper, Federal Practice and Procedure § 3722 at 444–45 (3d ed.1998). Thus, this court will separately consider both exceptions.

### 1. *Are Indeck's claims completely preempted by federal law?*

■ Indeck argues that the Federal Power Act, which grants to FERC the authority to determine if wholesale power rates are just and reasonable, 16 U.S.C. § 824d(a), completely preempts state law challenges to those rates. The Supreme Court has stated that complete preemption

occurs when a federal statute has such "extraordinary" force that it "converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). "Complete preemption" is a distinct concept from ordinary preemption. *Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R. Co.*, 858 F.2d 936, 941 (3d Cir.1988). The former provides that all state law actions within the scope of the federal cause of action are actually federal claims that must be addressed in federal court. *Franchise Tax Bd.*, 463 U.S. at 24, 103 S.Ct. 2841. Ordinary preemption, in contrast, is a defense that can be raised to actions in state court and does not provide for removal of actions pleading state law claims. *Caterpillar*, 482 U.S. at 393, 107 S.Ct. 2425.

Removal based on complete preemption, however, is available in only a few limited areas of federal regulation. The Third Circuit had identified two prerequisites to the application of complete preemption. First, it has noted that the Supreme Court has required that "Congress ... clearly manifest an intent" to make actions within a particular area removable to federal court. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Goepel*, 36 F.3d at 311. Second, it has required that Congress provide an inclusive federal claim that encompasses the state law remedies available to the plaintiffs. It has "held that the complete preemption doctrine applies only if 'the statute relied upon by the defendant as preemptive contains civil enforcement provisions within the scope of which the plaintiff's state claim falls.'" *Goepel*, 36 F.3d at 311 (citing *Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R. Co.*, 858 F.2d at 936, 942 (1988)).

Indeck argues that the Federal Power Act fails to establish these two prerequisites for complete preemption. It argues that the federal preemption provided for by the Federal Power Act is merely a federal defense and does not therefore require removal from state court. *See Caterpillar*, 482 U.S. at 392, 107 S.Ct. 2425 ("Ordinarily federal pre-emption is raised as a defense to the allegations in a plaintiff's complaint."). Indeck also notes that while the Federal Power Act does preclude some state law claims, *Mississippi Power and Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) (FERC determination that rates are just and reasonable preempts state court review of those rates), it contains no expression of Congress's intent to completely preempt all suits alleging state law or to require removal to federal court. Indeck find support for this argument in *Pan American Petroleum Corp. v. Superior Court*, 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584 (1961). In *Pan American*, the Supreme Court held that while the Natural Gas Act provides for the exclusive jurisdiction in federal court of suits enforcing rates for natural gas filed with the Federal Power Commission, it does not completely preempt all state law claims and require removal to federal court. *Pan American*, 366 U.S. at 664, 81 S.Ct. 1303. Indeck argues that the grant of "exclusive jurisdiction" in § 22 of the Natural Gas Act, 15 U.S.C. § 717u, discussed in *Pan American Petroleum*, is identical to § 317 of the Federal Power Act, 16 U.S.C. § 825p, relied upon by ISO–NE to support removal. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (noting the similarity between the Federal Power Act and the Natural Gas Act). Because of this similarity, Indeck argues that there is no basis for complete preemption of all

state law claims relating to federal filed rates for electrical power.

ISO–NE does not attempt to distinguish the enforcement provisions of the Natural Gas Act or the Court's holding in *Pan American Petroleum Corp.* Instead it cites the Court's statement in *Mississippi Power & Light Co.*, 487 U.S. at 371, 108 S.Ct. 2428, that "FERC has exclusive authority to determine the reasonableness of wholesale rates." However, the Supreme Court made clear in *Pan American Petroleum Corp.* that the term "exclusive jurisdiction" does not create complete preemption. 366 U.S. at 664, 81 S.Ct. 1303. Indeed, the Court implicitly recognized the absence of complete preemption in *Mississippi Power & Light Co.* when it stated that FERC's exclusive authority "binds both state and federal courts and is in the former respect mandated by the Supremacy Clause." 487 U.S. at 371, 108 S.Ct. 2428. Thus, the Federal Power Act does not completely preempt state law in the field of electrical power regulation because Congress has not manifested an intent to do so in the statute.

### 2. *Are Indeck's claims properly removable under the artful pleading doctrine?*

▇▇▇▇ ISO–NE argues that whatever the nature of the claims of Indeck's complaint, Indeck is, in actuality, asserting a cause of action arising under federal law and that the action was therefore properly removed under the "artful pleading doctrine." Under that doctrine "a court will not allow a plaintiff to deny a defendant a federal forum when the plaintiff's complaint contains a federal claim 'artfully pled' as a state law claim." *United Jersey Banks,* 783 F.2d at 367.

In support of its position, ISO–NE relies on two cases discussing state law challenges to telecommunications rates filed with the Federal Communications Com-

mission (FCC), *Marcus v. AT&T Corp.,* 138 F.3d 46 (2d Cir.1998), and *Cahnmann v. Sprint Corp.,* 133 F.3d 484 (7th Cir. 1998). In *Marcus,* the plaintiffs were customers of the defendant long-distance telephone company and sued in state court alleging that AT & T had defrauded them by not disclosing its practice of rounding-up the minutes billed for each call to the next highest minute. *Marcus,* 138 F.3d at 51–52. AT & T removed the action to federal court and some of the plaintiffs moved to remand to state court. The trial court denied the motion to remand and the Court of Appeals for the Second Circuit affirmed. The Second Circuit first ruled that complete preemption was inapplicable as grounds for removal because neither the Federal Communications Act nor federal common law contained a congressional intent for complete preemption to apply. *Id.* at 53–54. The artful pleading doctrine, however, could be the basis for removal because the plaintiffs' breach of warranty claims were an attempt, "[i]n essence," to enforce the provisions of the contract between AT & T and its customers, which was previously approved by the FCC and was therefore a filed rate with the force of law and not a mere contractual obligation. *Id.* at 56. The court noted that the "breach of warranty claim seeks to enforce the terms of the agreements between AT & T and its customers" and the "only possible source [of those agreements] is the tariffs filed in accordance with the [Federal Communications Act]." *Id.* Because these federal tariffs "are the law, not mere contracts," they "*conclusively and exclusively* enumerate the rights and liabilities of the contracting parties." *Id.* (citations omitted, emphasis in original). Thus, "the breach of warranty claim necessarily raises a substantial federal question over which federal courts may properly exercise jurisdiction." *Id.* On this basis,

the court ruled that denial of the plaintiffs' motion to remand was appropriate.

ISO–NE also relies on *Cahnmann v. Sprint Corp.*, 133 F.3d 484 (7th Cir.1998), in which the Seventh Circuit found that it was appropriate for a federal court to retain jurisdiction over a breach of contract action removed from state court on the basis that the plaintiffs were actually challenging a federal telecommunications tariff. In a breach of contract challenge to the amendment of Sprint's "Fridays Free" long-distance calling plan, the court ruled that such claims were completely preempted because the plan was a federally-filed tariff approved by the FCC both before and after its revisions. *Id.* at 489. The court ruled that the plaintiffs were actually challenging the FCC's approval of the amended tariff and "since the federal regulation defines the entire contractual relation between the parties, there is no contractual undertaking left over that state law might enforce. Federal law does not merely create a right; it occupies the whole field, displacing state law." *Id.* The Second Circuit in *Marcus,* 138 F.3d at 55, criticized this conclusion in *Cahnmann* that there was complete preemption of all breach of contract claims relating to federal tariffs, but would have agreed with its result on the facts presented under the artful pleading doctrine. Both the Seventh and Second Circuits thus agreed that the plaintiffs in each case were challenging the contractual obligations of the long-distance carrier and that those obligations were set by federal law. On this basis, both courts concluded that removal was appropriate because the actions "arose under" federal law.

ISO–NE argues that both *Marcus* and *Cahnmann* are analogous to Indeck's suit. Indeed, the Seventh Circuit's decision in *Cahnmann* recognizes the similarity between telephone and utility regulation and notes that public utility regulation and telecommunications regulation are "essentially the same form of regulation, the term 'common carrier' being generally used of firms providing transportation or communications and 'public utility' of firms providing electricity or gas." *Cahnmann,* 133 F.3d at 487. ISO–NE asserts that under both regulatory regimes, the utility or common carrier must submit its rates to the governing agency for consideration and approval. As stated by the Third Circuit, under § 205 of the Federal Power Act, "[p]ublic utilities must ... file with the FERC 'schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission,' and give notice to the FERC and the public of any proposed changes." *Boroughs of Ellwood City, Grove City, New Wilmington, Wampum, and Zelienople, Pennsylvania v. FERC,* 701 F.2d 266, 267 (3d Cir.1983); *see also* 16 U.S.C. § 824d(a). "Such rates are required to be just and reasonable." *Id.* FERC has determined that the Market Rules agreed to by NEPOOL and administered by ISO–NE are rates that must be filed and approved under the Act. *New England Power Pool,* 85 FERC ¶ 61,379, 1998 WL 881297 (1998) (approving NEPOOL's proposed market rules).

Indeck responds by arguing that its suit does not challenge the Market Rules. Instead, it argues that it has presented solely state law claims relating to contractual obligations between it and ISO–NE. Indeck points to Part II.b.2 of Market Rule 17, which permits ISO–NE to enter contracts for the provision of energy from units seldom run in times of transmission constraints, as evidence that ISO–NE has the power to enter contracts with energy providers. While Indeck's complaint does not argue that it had a contract with ISO–NE pursuant to that provision of Market Rule 17, it does argue that the Rule supports its assertion that ISO–NE is vested

with the power to enter contracts with energy providers under its governing regulations. Because it is alleged that ISO–NE can enter contracts outside the scope of the filed tariff, Indeck argues that this case is distinguishable from *Marcus* and *Cahnmann,* in which the courts held that the filed rate approved by the FCC was the sole basis for contractual obligations between the parties. *Marcus,* 138 F.3d at 56; *Cahnmann,* 133 F.3d at 488.

Indeck argues that its claims are not a challenge to the filed rate—the Market Rules approved by FERC. It has not, however, cited authority in the Market Rules, Interim ISO Agreement, or another document that specifies ISO–NE's authority to enter the type of obligation it asserts here. While Market Rule 17 does provide a limited authority for contractual obligations between ISO–NE and NEPOOL participants, Indeck does not rely on this authority. Instead, as previously noted, Indeck invokes its posted bids in the spot energy market throughout its complaint as setting forth the terms of the alleged agreement between Indeck and ISO–NE. Indeck cites no other evidence, other than its posted bids to provide energy at $9,999 per Mwh on the terms specified, that might serve as a genesis of the alleged obligations between Indeck and ISO–NE. Because Market Rule 5 governs the acceptance and rejection of bids in the spot energy market, Indeck's breach of contract claims seek, as remedy, the imposition of Indeck's terms under Market Rule 5. *See* Complaint at ¶ 42 (stating that Indeck incurred damages "at an agreed price of $9,999 per Mwh for Energy and for an agreed Minimum Run Time of twenty-four hours and Low Operating Limit of 10 Mwh."). Its suit, while purportedly alleging only contractual obligations, is, in reality, a challenge to ISO–NE's authority to determine whether competitive bidding under Market Rule 5 should govern Indeck's provision of energy or whether ISO–NE should have the authority to mitigate those bids pursuant to Market Rule 17. Indeck's contractual claims seek relief consistent with the former and its factual allegations frequently invoke its bidding as the source of ISO–NE's alleged obligations.

Indeck argues that, because it can show ISO–NE is not prohibited from entering contracts unrelated to the Market Rules, the court must then conclude it has alleged only state claims. However, apart from references to the allegedly inapposite contractual provisions of Market Rule 17, Indeck has not shown where the Market Rules or any other document gives ISO–NE the authority to enter contracts like the one it has alleged. Moreover, even if ISO–NE did have this authority, it remains the case that Indeck's cause of action, however styled, request a remedy pursuant to Market Rule 5 and seeks to avoid the imposition of mitigation under Rule 17. Thus, the claims are entirely related to the federal tariff and do not arise from some obligation unrelated to the bidding for energy in the spot market. Judge Posner's opinion in *Cahnmann* makes this very distinction between actions challenging tariffs in regulated industries and actions challenging other contractual obligations in that industry.

> It is not as if the "Fridays Free" tariff had promised free calls and another provision of a contract between the plaintiff and Sprint had promised to sell the plaintiff a bushel of Ugli fruit at market price. If the promises were severable, ... the plaintiff could sue to enforce the latter promise though not the former. There is no space between the contract and the tariff here ... and so there is no room for a state law claim of breach of contract.

*Cahnmann,* 133 F.3d at 489. Similarly, had the obligation between Indeck and

ISO–NE arisen from some obligation other than the provision of energy in the spot market, Indeck can sue on that contract. But it cannot sue on obligations entirely governed by a federally-approved tariff.

In its briefing, Indeck argues it is not suing to enforce obligations arising in the spot market for energy. Indeed, to distinguish its claims from those arising under Market Rule 5, it describes the spot market for energy by using the only characteristic of the spot market that might differentiate its claims—the "day-ahead dispatch." The fact that the spot market for energy is a day-ahead market and Indeck asserts that ISO–NE's obligations arose before that point does not, however, change the nature of Indeck's claims. According to Indeck's complaint, bidding under Market Rule 5 is typically submitted the day before the energy transmission. When NEPOOL participants do not bid, their last valid bid is used as a "standing bid" in the spot energy market. Indeck repeatedly asserts that it is its standing bid of $9,999 per Mwh that was accepted by ISO–NE on each occasion prior to the usual day-ahead dispatch. Indeck has not explained, either in its complaint or its briefing, how this temporal distinction separates its claims from the typical transaction in the spot market. That the alleged contract may have been made at a different time from the typical spot market transaction does not change the nature of the relief sought by Indeck—compensation consistent with Market Rule 5.

■ Thus, the court concludes that Indeck's complaint arises under federal law because Indeck has sought to present a challenge to a federally-approved tariff in the guise of a state contractual claim. Because the artful pleading doctrine does not permit litigants to "frustrate a defendant's right of removal by carefully pleading the case without reference to any federal law,"

Indeck's motion to remand this action to the Superior Court will be denied.

### B. *Should this Action be Dismissed for its Failure to State a Claim?*

■ Having concluded that Indeck's claims arise under federal law, the court will proceed to address whether federal law can afford relief in this action or whether ISO–NE's motion to dismiss should be granted. ISO–NE has set forth five arguments in support of its motion to dismiss. It argues that (1) Indeck's claims are barred by the "filed rate" doctrine; (2) Indeck's claims should be dismissed under the "primary jurisdiction" doctrine; (3) Indeck has failed to exhaust FERC approved alternative dispute resolution procedures; (4) ISO–NE cannot be liable under § 10 of the Interim ISO Agreement; and that (5) Indeck has not joined indispensable parties.

■ The filed rate doctrine bars both federal and state claims challenging a tariff "that a federal agency has reviewed and filed." *County of Stanislaus v. Pacific Gas & Elec. Co.,* 114 F.3d 858, 866 (9th Cir.1997). The doctrine was developed as a means of preserving the integrity of congressionally-approved regulatory regimes by prohibiting judicial consideration of the agency's rate determinations. *Arkansas Louisiana Gas Co.,* 453 U.S. at 577–78. It has been applied to tariffs established under the Federal Power Act at least as early as the Supreme Court's decision in *Montana–Dakota Utils. Co.,* in which Justice Jackson, for the Court, described the doctrine in the following language.

A court may think a different [rate] more reasonable. But the prescription of the statute is a standard for the [Federal Power] Commission to apply and, independently of Commission action,

creates no right which courts may enforce.

Petitioner cannot separate what Congress has joined together. It cannot litigate in a judicial forum its general right to a reasonable rate, ignoring the qualification that it shall be made specific only by exercise of the Commission's judgment, in which there is some considerable element of discretion. It can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms.

We hold that the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one.

*Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 251–252, 71 S.Ct. 692, 95 L.Ed. 912 (1951). Thus, the filed rate doctrine bars the court's imposition of a remedy that would change a rate approved by FERC, the successor to the Federal Power Commission. An administrative proceeding before FERC is the only appropriate forum for challenging the reasonableness of a filed rate. *See Mississippi Power & Light Co.,* 487 U.S. at 355, 108 S.Ct. 2428; *Arkansas Louisiana Gas Co.,* 453 U.S. at 577, 101 S.Ct. 2925.

The parties do not dispute the scope of the filed rate doctrine. Instead, Indeck claims that it does not apply here because it has alleged state contract law claims. It points to *Town of Norwood, Massachusetts v. New England Power Co.,* 202 F.3d 408 (1st Cir.2000) for the proposition that the filed rate doctrine need not preclude contract claims in every case. *Town of Norwood* is easily distinguished from this case.

In *Town of Norwood,* the First Circuit found that the applicable filed rate was a termination charge that only applied to requirements contracts between energy providers and purchasers. *Id.* at 416. The court could determine the wholly contractual question of whether a requirements contract existed, and thus whether the charge even applied, before determining whether the plaintiff's suit challenged the filed rate. *Id.* In this case, there is no prerequisite contract question that can be resolved prior to evaluating whether the plaintiff challenges a filed rate. Rather, as discussed in the treatment of the motion to remand, Indeck is challenging in this suit whether it should be compensated for its actions in October 1997 pursuant to competitive bidding in the spot market under Market Rule 5 or whether that bidding should be mitigated pursuant to Market Rule 17.

Indeck's primary argument in opposition to the motion to dismiss is that the filed rate doctrine is inapplicable to the action because its complaint does not challenge a federally filed rate. Its arguments in this respect reprise the assertions made in support of its motion to remand; namely, that its complaint alleges only state law contract claims and specifically disclaims a challenge to the Market Rules. These arguments, however, were rejected by the court in considering Indeck's motion to remand and will be rejected here. Indeck's complaint challenges ISO–NE's mitigation of Indeck's bid pursuant to Market Rate 17. While Indeck argues that it is actually asserting the existence of a bilateral contract, it cannot deny that the terms of the alleged contract it seeks to enforce are those of its standing bid for the provision of energy in the spot energy market. In brief, Indeck seeks to supplant ISO–NE's discretion to impose mitigation by seeking, as its contractual relief, the price it would have received had ISO–NE ac-

cepted its standing bid pursuant to the regular operation of Market Rule 5 in the spot energy market.

In an effort to undermine the evidentiary support for characterizing its complaint as a challenge to a filed rate, Indeck asserts that there are no facts supporting ISO–NE's assertion that it mitigated Indeck's bid pursuant to Market Rule 17. Indeck points out that the court must accept the allegations of the complaint as true in considering a motion to dismiss and argues that complaint does not assert that ISO–NE imposed mitigated prices upon it. According to Indeck, because there is no evidence that ISO–NE sought to mitigate its rates pursuant to Market Rule 17, then its claims must rest in contract because they cannot challenge the Market Rules.

Indeck's argument that its complaint does not allege that ISO–NE sought to mitigate is not supported by the text of the complaint, which frequently references ISO–NE's attempt to mitigate the rates even if it does not directly assert the nature of ISO–NE's intentions. Paragraphs 23 and 24, for example, discuss ISO–NE's attempt to impose a mandatory mitigated bid ceiling on Indeck and Paragraph 24 specifically asserts that ISO–NE insisted it would mitigate Indeck's bid for the October 16–17, 1999 transmission period. Similarly, Exhibit G of the Indeck complaint is an e-mail from an ISO–NE employee specifically stating ISO–NE's offer "to apply the $1,000/mwh mitigated bid to calculate transmission congestion uplift for October, 1999." While these statements each occurred after the October 1999 events alleged to create a contract between the parties, Indeck has not explained why ISO–NE, if it wants to mitigate prices, must state its intention to do so prior to the dispatch of energy. In fact, Part II.D of Market Rule 17 only requires ISO–NE to notify the unit being mitigated "[a]s soon as reasonably possible after the ISO

has determined that a resource or portion of a resource will be subject to mitigation." While it appears from the complaint that ISO–NE did not expediently inform Indeck of its intention to mitigate Indeck's bid, the complaint does not assert that ISO–NE's claimed mitigation is invalid because of this delay.

Thus, the court concludes that Indeck's action is barred by the filed rate doctrine and it will grant ISO–NE's motion to dismiss. The court will not consider ISO–NE's other arguments proffered in support of its motion.

The court will enter an order in accordance with this opinion.