*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0232P (6th Cir.)
File Name: 04a0232p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MCI TELECOMMUNICATIONS
CORP.,

        *Plaintiff-Appellee,*

     *v.*

THE OHIO BELL TELEPHONE
COMPANY, d/b/a SBC OHIO,

        *Defendant-Appellant,*

ALAN R. SCHRIBER, RHONDA
HARTMAN FERGUS, JUDY A.
JONES, DONALD L. MASON,
and CLARENCE D. ROGERS,
JR., in their Official
Capacities as Commissioners
of the Public Utilities
Commission of Ohio,

        *Defendants-Appellees.*

No. 03-3525

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 97-00721—Edmund A. Sargus, Jr., District Judge.

Submitted: June 15, 2004

Decided and Filed: July 20, 2004

Before: GILMAN and COOK, Circuit Judges; CLELAND,
District Judge.

_____

## COUNSEL

**ON BRIEF:** Dennis G. Friedman, MAYER, BROWN,
ROWE & MAW, Chicago, Illinois, Daniel R. Conway,
PORTER, WRIGHT, MORRIS & ARTHUR, Columbus,
Ohio, for Appellant. Donald B. Verrilli, Jr., JENNER &
BLOCK, Washington, D.C., Terri L. Mascherin, Daniel J.
Weiss, JENNER & BLOCK, Chicago, Illinois, Duane W.
Luckey, Columbus, Ohio, Steven T. Nourse, Jodi J. Bair,
OFFICE OF THE ATTORNEY GENERAL, Columbus,
Ohio, for Appellees.

_____

## OPINION

_____

   CLELAND, District Judge. Defendant-Appellant Ohio
Bell Telephone Company ("SBC") appeals the district court's
order affirming the arbitration decision of the Public Utilities
Commission of Ohio ("PUCO"). Although PUCO arbitrated
over 40 open issues between SBC and Appellee MCI
Telecommunications Corp. ("MCI"), SBC appeals only one
issue: whether the district court erred in its interpretation of
FCC Rule 711(a)(3) and in affirming PUCO's decision to

_____

*The Honorable Robert H. Cleland, United States District Judge for
the Eastern District of Michigan, sitting by designation.

award MCI the tandem reciprocal compensation rate for calls that originate on SBC's network and terminate on MCI's. We AFFIRM the judgment of the district court.

## I. FACTS AND PROCEDURAL HISTORY

### Telecommunications Act of 1996 and Implementing Regulations

In 1996, pursuant to the Telecommunications Act of 1996 (the "1996 Act" or "Act"), MCI began negotiating an "interconnection agreement" with SBC for telephone service in Northeastern Ohio. Such agreements were made possible by the 1996 Act, which Congress enacted to "promote competition in all telecommunications markets, including the local service market." *Michigan Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 865 (6th Cir. 1999). Congress sought to eliminate state-sanctioned monopolies and adopt a national policy for telecommunication competition in local markets. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 370 (1999) ("The Telecommunications Act of 1996 (1996 Act or Act), Pub.L. 104-104, 110 Stat. 56, fundamentally restructures local telephone markets. States may no longer enforce laws that impede competition, and incumbent [local exchange carriers] are subject to a host of duties intended to facilitate market entry. Foremost among these duties is the [Local Exchange Carrier's (LEC's)] obligation under 47 U.S.C. § 251(c) (1994 ed., Supp. II) to share its network with competitors.").

Before the Act, local telephone service was mostly provided by state-regulated monopolies, now commonly referred to as incumbent local exchange carriers ("incumbent providers"). In this case, SBC is the incumbent provider for telephone service in Northeast Ohio.

In order to promote competition in the telecommunications market, the 1996 Act requires incumbent providers to allow new market entrants, such as MCI in this case, to utilize the incumbent provider's network and buy the incumbent provider's telecommunication services for a fair price. *See* 47 U.S.C. §§ 251(a)(1) & (c). These arrangements were necessary to minimize the barriers to market entry erected during the period in which the incumbent provider functioned as a monopoly. Pursuant to the Act, the incumbent provider is required to negotiate an agreement, referred to as an "interconnection agreement," with a new market entrant, or a competing local exchange carrier ("competing provider"). If the parties cannot agree upon certain terms in the agreement, either party can petition the state utility commission to arbitrate the open issues. *See id.* at § 252(b)(1). The state commissions arbitrate the dispute, ensuring that its resolution of the open issues meets the requirements of the 1996 Act and the Federal Communication Commission's ("FCC's") implementing regulations. *Id.* at § 252(c).

After the state utilities commission arbitrates the open issues, the parties submit the completed interconnection agreement to the state commission, which either approves the final agreement or rejects it. The state commission may reject the agreement if it does not comply with the 1996 Act or the FCC's regulations, discriminates against other non-party telecommunications providers, or is inconsistent with the public interest. *Id.* at § 252(e). If either or both parties disagree with the interconnection agreement, as arbitrated by the state commission, they may seek review in federal district court. *Id.* at § 252(e)(6).

In the new competitive telecommunications marketplace, a customer who places a call through his provider may be routed from his provider's network to another provider's network in order to complete the call. This typically occurs when a person places a local call to someone who receives local telephone service from a different provider than that of the caller (e.g., an SBC customer calls an MCI customer). In this situation, the calling party's provider would require the assistance of the called party's provider in switching the call

over to the separate network. Although the calling party pays only its provider for the call, the called party's provider incurs costs in transporting and terminating the call. In the absence of an agreement with the calling party's provider, the called party's provider would go uncompensated for its service.

Through interconnection agreements, the providers agree to a compensation structure that allows parties from different providers to seamlessly complete calls to one another. The 1996 Act requires providers to enter into "reciprocal compensation arrangements" to compensate each other when inter-network calls are completed. *Id.* at § 251(b)(5). The reciprocal compensation rates are to be based upon a "reasonable approximation of the additional costs" incurred by the provider that transports and terminates the call that originates on another network. *Id.* at § 252(d)(2)(A)(ii). Congress, however, elected to avoid in-depth inquiries into the actual costs incurred by providers. *Id.* at § 252(d)(2)(B)(ii) (the provision regarding reciprocal compensation shall not be construed "to authorize the Commission or any State commission to engage in any rate regulation proceeding to establish with particularity the additional costs of transporting or terminating calls, or to require carriers to maintain records with respect to the additional costs of such calls."). Instead, Congress left the task of implementing the 1996 Act, including the reciprocal rate provision, to the FCC. *Id.* at § 251(d)(1).

In 1996, the FCC published its governing regulations regarding reciprocal compensation. The FCC concluded that reciprocal compensation rates should be symmetrical between interconnected telecommunications carriers and based on the incumbent provider's cost studies. *See* 47 C.F.R. § 51.711(a). Thus, the state commission should apply the same rate no matter which provider, the incumbent or competitor, transports and terminates a call originating from the other's network.

This regulation is based on the FCC's conclusion that the incumbent provider's costs for transporting and terminating a call should be a reasonable approximation, or "presumptive proxy" of the costs for other providers. *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15,499, 16,040 (1996) ("Both the incumbent LEC and the interconnecting carriers usually will be providing service in the same geographic area, so the forward-looking economic costs should be similar in most cases. We also conclude that using the incumbent LEC's forward-looking costs for transport and termination of traffic as a proxy for the costs incurred by interconnecting carriers satisfies the requirement of section 252(d)(2) that costs be determined 'on the basis of a reasonable approximation of the additional costs of terminating such calls.' Using the incumbent LEC's cost studies as proxies for reciprocal compensation is consistent with section 252(d)(2)(B)(ii), which prohibits 'establishing with particularity the additional costs of transporting or terminating calls.'"). The incumbent's economic cost study is relied upon to determine the appropriate costs because smaller new entrants are typically not in a position to conduct a "forward-looking economic cost study." *Id.*

Recognizing the intricacies of local telecommunications networks, beyond the general policy of symmetrical rates, the FCC established a more detailed two-tier scheme for determining reciprocal compensation rates. The two-tiered approach takes into account the telecommunications equipment used to transfer and complete a particular call-- either "tandem" or "end-office" switches. Historically, incumbent providers used these two switches to route calls. A tandem switch acts as a hub connecting other switches and is generally able to handle calls over a broad geographic area. End-office switches typically serve smaller geographic areas and fewer customers. Acknowledging that the cost associated with transferring calls differs depending on the type of switch used, the FCC held that "states may establish transport and

termination rates in the arbitration process that vary according to whether the traffic is routed through a tandem switch or directly to the end-office switch." *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. at 16042. The FCC also recognized that new entrants may utilize new technology other than the two switches commonly used by incumbent providers. "In such event, states shall also consider whether [these] new technologies (e.g., fiber ring or wireless networks) perform functions similar to those performed by an incumbent LEC's tandem switch and thus, whether some or all calls terminating on the new entrant's network should be priced the same as the sum of transport and termination via the incumbent LEC's tandem switch." *Id*.

Most important to the issue currently before the court, the FCC established a rule for determining whether the new provider's switch generally serves the same role as a tandem switch serves in the incumbent's network (i.e., whether the entrant can charge the tandem rate when employing new technology). Rule 711(a)(3) provides: "Where the switch of a carrier other than an incumbent LEC serves a geographic area comparable to the area served by the incumbent LEC's tandem switch, the appropriate rate for the carrier other than an incumbent LEC is the incumbent LEC's tandem interconnection rate." 47 C.F.R. § 51.711(3).

**The Interconnection Agreement Between SBC and MCI**

In this case, MCI was beginning to offer local telephone service in Ohio and sought an interconnection agreement from the incumbent provider, SBC. n 1994, under pre-Act pro-competitive state regulations, MCI applied to PUCO for permission to offer local service in three Ohio counties: Cuyahoga, Franklin, and Montgomery. PUCO examined MCI's business and technical capabilities and, on December 31, 1996, certified MCI to provide local service in the three counties.

One of the sticking points during negotiation of the interconnection agreement was the appropriate reciprocal compensation rate that SBC would pay MCI when MCI incurred costs by transporting and terminating a call on its network that originated from SBC's network. Rather than using a series of tandem switches and end-office switches, MCI utilized new technology, especially fiber optic rings, to reach all of its customers in a local service area by using only one switch--a "Siemen's Class 5" telecommunications switch located in Cleveland, Ohio. The parties could not agree upon the appropriate reciprocal compensation rate to compensate MCI for transporting and terminating calls that originate on SBC's network, and thus submitted this issue, along with nearly 50 others, to PUCO for arbitration pursuant to 47 U.S.C. § 252.

PUCO considered the parties' positions and accepted both written and live testimony during the arbitration proceeding, and, on January 9, 1997, issued its Arbitration Award. In the Award, PUCO decided all outstanding issues and directed the parties to submit a modified interconnection agreement.

PUCO decided that MCI could charge SBC the *tandem* reciprocal compensation rate rather than the lower *end office* reciprocal compensation rate. PUCO considered the prefiled testimony of Maria Marzulla, a senior manager of MCI's Local Network Engineering Group, who described MCI's technology and network capabilities. She testified that "MCI's switches all serve areas at least equal in size if not greater than the serving area of the [incumbent provider's] tandem [switch]," and cited to examples of MCI's network in Baltimore and New York. Although during live testimony, Ms. Marzulla was unable to give an estimate of actual customers being served by MCI's switch at the time of the hearing, she reemphasized that the MCI switch is capable of serving a geographic area comparable to the area served by SBC's tandem switch. SBC did not offer testimony or evidence regarding the geographical reach of MCI's switch,

but instead argued that MCI was required to show that it was already servicing customers in a geographic area comparable to SBC.

PUCO rejected SBC's argument:

The fundamental question then becomes: does MCI's switch located in Cleveland serve an area comparable to that served by Ameritech's tandem switch. We turn our attention to MCI's conditional certificate approved in Case No. 94-2012-TP-ACE, wherein the Commission granted MCI authority to provide local telecommunications service in Cuyahoga, Franklin, and Montgomery counties. We will presume, given the start-up nature of MCI's operations, that MCI shall serve the area for which we found it worthy of a certificate. In our view, that is a comparable service area.

*In the Matter of Petition of MCI Telecommunications Corp. for Arbitration Pursuant to Section 252(b) of the Telecommunications Act of 1996 to Establish an Interconnection Agreement with Ameritech Ohio*, No. 96-888-TP-ARB (Jan. 9, 1997) ("PUCO Arbitration"). PUCO based its decision on the "best information" it had and asked the parties to "provide regular reports to the Commission's telecommunications staff so that [it] may receive ongoing information." (*Id.*)

**Appeal of The Arbitration Decision**

Pursuant to 47 U.S.C. § 252(e)(6), SBC sought review of the arbitration determination in the United States District Court (S.D. Ohio), challenging various aspects of PUCO's decision, including the reciprocal compensation rate finding. SBC claimed that, to the extent MCI was permitted to charge the tandem reciprocal compensation rate, the agreement (entered into after the arbitration) violated 47 U.S.C. § 252(d)(2) because MCI had not shown that its switch

actually served customers in a comparable geographic area as SBC.

On March 21, 2003,[1] the district court affirmed PUCO's decision awarding MCI the tandem reciprocal compensation rate. The court concluded that PUCO applied the correct legal test because it considered the appropriate regulation, 47 C.F.R. § 51.711(a). It then went on to conclude, under the arbitrary and capricious standard, that PUCO did not err in finding that "MCI had the capacity to serve a region in northeastern Ohio for which it had applied and obtained a Certificate of Operation." (03/19/03 Order at 11.) The court deferred to PUCO's previous determination that "MCI [was] able to serve the area in question" and the issuance of an operating license to MCI. (*Id.*) Accordingly, SBC's claim was dismissed.

**II.  JURISDICTION**

This case arises under the Telecommunications Act of 1996, which permits a party to appeal the final arbitration decision of the state utilities commission to a federal district court. 47 U.S.C. § 252(e)(6). Generally, this court has jurisdiction over an appeal from the district court's order pursuant to 28 U.S.C. § 1291.

Appellee PUCO, however, argues that jurisdiction is lacking because the case is either moot or because the majority of SBC's challenge to the reciprocal compensation rate is not yet ripe for decision.

---

[1]The matter remained pending before the district court for approximately six years. The district court stayed the action, awaiting decisions from the FCC and United States Supreme Court that could have had a bearing on the case. In the meantime, while the action was pending, the parties' interconnection agreement expired and the parties entered into a new agreement in early 2003.

First, we disagree with the contention that this case has been rendered moot by the parties' 1997 interconnection agreement or the superseding interconnection agreement in 2003. The fact that the parties accepted PUCO's arbitration decisions and incorporated them into their 1997 interconnection agreement, and thus agreed to operate under such terms during the pendency of this appeal, does not preclude SBC from seeking reimbursement based on the lower rate. MCI, a party to the 1997 agreement, agrees. If we were to hold otherwise and find that the interconnection agreement rendered the appeal from the arbitration decision moot, telecommunication companies would be forced to forgo entering into interconnection agreements in order to preserve their appeal. The new entrant to the market would not be able to efficiently serve its customers (without an interconnection agreement) until the appellate process ran its course, further entrenching the incumbent provider and creating the risk that the new entrant's technology could become outdated in the meantime. Parties are free to continue business relations with an understanding that one party might pursue appeal, and thus seek reimbursement, through the process permitted by federal law. *See* 47 U.S.C. § 252(e)(6). MCI maintained its relationship with SBC with this understanding. *See Indiana Bell Tel. Co. Inc. v. McCarty*, 362 F.3d 378 (7th Cir. 2004) (considering the merits of an appeal from the arbitration decision despite the fact that the parties entered into, and operated under, an interconnection agreement that incorporated the arbitrator's disputed decisions).

Similarly, the parties' most recent interconnection agreement, entered into in 2003, does not affect the justiciability of SBC's appeal. The contract expressly permits either party to seek a judicial order revising the agreement and authorizes retroactive relief (i.e., reimbursement for rates paid). The parties reserved all rights and remedies with respect to collection of rates and charges under the interconnection agreement. Accordingly, by its express

terms, the 2003 interconnection agreement does not render the instant appeal moot.

PUCO next argues that a refund, or retroactive relief, is not available to SBC under the "filed rate doctrine." The classic example of application of the filed rate doctrine, often referred to as the filed tariff doctrine, can be found in the Supreme Court's decision in *Louisville & Nashville R. Co. v. Maxwell,* 237 U.S. 94 (1915). In that case, the Supreme Court held that a passenger who purchased a train ticket at a rate misquoted by the ticket agent did not have a defense against the subsequent collection of the higher tariff rate by the railroad.

> Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

*Id.* at 97. The filed rate doctrine requires that common carriers and their customers adhere to tariffs filed and approved by the appropriate regulatory agencies. In essence, PUCO argues that SBC cannot obtain a refund for rates paid to MCI in the past under this doctrine. We disagree.

First, and most importantly, SBC is not arguing that the tandem rate itself should be different (i.e., SBC is not arguing that the rate is incorrect or was unreasonably set) or that it is per se unreasonable. The issue is whether SBC is required to pay the tandem rate or the end office rate, which may depend

upon the interpretation of the regulations governing symmetrical rates. A ruling by this court will have no effect on the filed tariff or rate. Thus, SBC is not challenging the filed tariff, but is merely appealing the arbitration decision that applied one rate rather than another. Such appeals are expressly permitted under the Telecommunications Act and the parties agreed that a refund could be sought in their most recent interconnection agreement. PUCO has cited no persuasive authority otherwise.

Further, the two most important purposes for the filed rate doctrine are not implicated if the court reviews PUCO's decision and the resulting rate terms of the interconnection agreement. The filed rate doctrine prevents carrier discrimination by committing the carriers to one set tariff and preserves the role of administrative agencies in approving and setting rates, a practice at which they are particularly adept. *See Fax Telecommunications Inc. v. A.T.&T.*, 138 F.3d 479, 489 (2d Cir. 1998) (describing the two principles emanating from the filed rate doctrine). Neither of these principles are threatened in this case, nor is there a potential that SBC is vying for a lower rate in some unfair manner or for some ulterior motive. Rather, SBC merely wants the court to review PUCO's and the district court's interpretation (and possibly application) of the regulations. The filed rate doctrine does not reach a circumstance such as this one, and thus SBC is entitled to seek retroactive relief.[2]

---

[2]There is also no real dispute that SBC, if successful on appeal, may also be entitled to prospective relief. We reject PUCO's misplaced argument that SBC's claim for prospective relief is not yet ripe because the issue is currently fit for judicial review and will clarify not only future decisions affecting the interconnection agreement, but also the past and current agreements. Moreover, SBC's arguments regarding the potential that this issue could evade judicial review because of the relatively quick turnover of interconnection agreements further persuades the court to render a decision in this matter.

## III. STANDARD OF REVIEW

We review the district court's interpretation of Rule 711(a)(3) *de novo* and its ultimate factual findings under the arbitrary and capricious standard of review. Although the district court reviewed PUCO's arbitration decision strictly under the arbitrary and capricious standard of review, the primary issue before that court, and currently before this court, is a question of law--whether FCC Rule 711(a)(3) requires that the new market entrant's switch *actually serve customers* across a comparable geographic area in order for the new entrant to charge the incumbent's tandem interconnection rate.[3] The interpretation of the rule, a question of law, must be reviewed *de novo. See Michigan Bell Tel. Co. v. Strand*, 305 F.3d 580, 586 (6th Cir. 2002).

## IV. DISCUSSION

Although PUCO's and the district court's decisions are somewhat equivocal, the court accepts SBC's proposition that both PUCO and the district court issued their decisions, awarding MCI tandem reciprocal compensation, based upon an interpretation of Rule 711(a)(3) that merely requires MCI's switch to have the ability to serve a comparable geographic area rather than a requirement that MCI actually serve customers over the same geographic area. Rule 711(a)(3) provides:

Where the switch of a carrier other than an incumbent LEC serves a geographic area comparable to the area served by the incumbent LEC's tandem switch, the appropriate rate for the carrier other than an incumbent

---

[3]SBC agrees that, under an interpretation that does not require actual service to customers (the interpretation that it argues against), there is no challenge to the factual finding that MCI's switch can serve a geographic area equal in coverage to SBC's.

LEC is the incumbent LEC's tandem interconnection rate.

47 C.F.R. § 51.711(a)(3). The court must decide whether this rule requires the new entrant to be actually serving customers over a comparable geographic area before charging the tandem interconnection rate or whether the new entrant's *capability* to serve customers over a comparable geographic area suffices. For the reasons set forth below, we affirm the district court's decision and interpret Rule 711(a)(3) as requiring the new entrant's switch to be capable of serving a comparable geographic area, as opposed to a requirement that the new entrant actually serve customers in that area.

First, the language of Rule 711(a)(3) does not require the switch to be serving customers dispersed over a certain geographic area. As MCI notes, "[n]othing in the text of Rule 711(a)(3) refers to the physical location of a carrier's customers. The grammatical object of the regulation's language--the thing 'served' by the competing carrier's switch--is the '*geographic area*,' not particular customers." The focus of Rule 711(a)(3) is on the switch's ability to transmit communication over a certain area.[4] If a new entrant can offer a comparable area for switching and terminating calls that originate on the incumbent's network, the tandem interconnection rate applies so that the new entrant may recoup its approximate costs.[5]

---

[4] Perhaps a fitting example for illustrative (or grammatical) purposes is a city fire department. Although the department may have never had to put out a fire or respond to a call on a particular block or locale within the city, it still "serves" the entire city.

[5] The court is not persuaded by SBC's argument that the tandem interconnection rate is an unfair rate to charge when MCI has fewer customers than SBC. If MCI has few customers, SBC will rarely have to pay the tandem interconnection rate because few calls would be transmitted from SBC's network to MCI's network. Conversely, as

As a practical matter, a new entrant to the telecommunications market will not have as large a customer base as an incumbent that has operated as a monopoly for a number of years. Under SBC's interpretation, a new entrant would operate under a significant disadvantage when it first enters a particular market, and possibly forever, because it would not be permitted to charge the higher tandem reciprocal rate for its new technology even though that technology is able to carry communications over expansive geographic areas. In essence, if a new entrant could not charge the tandem rate until it had nearly as many customers as the incumbent, the new entrant may be hampered in gaining market share (i.e., obtaining customers) because it may not be able to obtain full compensation for its switch and thus be unable to competitively charge its customers. This would thwart the main purpose behind the 1996 Act, the opening of local telecommunications markets to competition.

The FCC's Wireline Competition Bureau[6] recognized this in its *Virginia Arbitration Order*, in which it held that "the determination whether a [new entrant's] switch 'serves' a

---

MCI's customer base expands, SBC will surely have to pay the tandem reciprocal rate more frequently because more calls will be exchanged, but it will also reap the benefits of more calls being transferred from MCI's network to SBC's for termination. Thus, the size of MCI's customer base, even if much smaller than SBC's, does not appear to create such a dramatic inequity in costs.

[6] The FCC delegated the task of arbitrating an interconnection agreement dispute, similar to the one in this case, to the Bureau. The Bureau "advises and makes recommendations to the Commission, or acts for the Commission under delegated authority, in all matters pertaining to the regulation and licensing of communications common carriers and ancillary operations (other than matters pertaining exclusively to the regulation and licensing of wireless telecommunications services and facilities)." 47 C.F.R. § 0.91. "As such, it has unique expertise in the area of interpreting rules promulgated by the FCC." *Indiana Bell Tel. Co., Inc. v. McCarty*, 362 F.3d 378, 386 (7th Cir. 2004).

certain geographic area does not require an examination of the competitor's customer base." *Virginia Arbitration Order*, 17 FCC Rec. at ¶ 307. The Bureau rejected the incumbent's argument that the new entrant had to actually be serving customers dispersed over a comparable geographic area to charge the tandem reciprocal rate under Rule 711(a)(3). Instead, it stated:

> The tandem rate rule recognizes that new entrants may adopt network architecture different from those deployed by the incumbent; it does not depend upon how successful the [new entrant] has been in capturing a 'geographically dispersed' share of the [incumbent's] customers, a standard that would penalize new entrants. We agree . . . therefore, that the requisite comparison under the tandem rate rule is whether the [new entrant's] switch *is capable of serving* a geographic area that is comparable to the architecture served by the [incumbent's] tandem switch.

*Id.*

As the Seventh Circuit recently held, the Bureau's interpretation should be afforded deference and thus result in affirmance of the decisions below. In *Indiana Bell Telephone Company v. McCarty*, the Seventh Circuit, sitting *en banc*, held that the decision of the Bureau outlined above is entitled to deference as a decision of the FCC interpreting its own rules. 362 F.3d at 386 ("We find the [Bureau's] pronouncement on this issue not only persuasive, given the Act's overarching goal of promoting competition and the [Bureau's] expertise in this area, but one requiring deference as the voice of the FCC interpreting its own rules.") (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984)). The Seventh Circuit acknowledged that the Bureau's decision was subject to review by the FCC, but held that, "[w]hen, as here, Congress has expressly permitted delegation of authority by statute, *see* 47 U.S.C. § 155(c), and

the agency delegates authority to a subdivision, 'the decision of the subdivision is entitled to the same degree of deference as if it were made by the agency itself.'" *Id.* at 387 (citing *MCI Metro Access Transmission Servs., Inc. v. BellSouth Telecommunications, Inc.*, 352 F.3d 872, 880 n.8 (4th Cir. 2003)). Accordingly, the Seventh Circuit held that it was required to follow the Bureau's interpretation until the FCC ruled otherwise. We are not aware of FCC authority to the contrary and we are convinced, as was the Seventh Circuit, that the Bureau's decision is not only persuasive, but also entitled to deference under *Chevron*. *See* 47 U.S.C. § 155(c)(3).

Under this interpretation of Rule 711(a)(3), the district court did not err in affirming the arbitration panel's factual finding that MCI's switch covered a geographic area comparable to SBC's. MCI described its technological capabilities to the panel and offered the testimony of a senior manager from MCI who testified that MCI's switches serve areas equal in size, if not greater than those served by the incumbents. Finally, PUCO relied on the fact that MCI had obtained approval from PUCO to serve the three relevant counties in Ohio. In light of the set-up costs and the procedures that MCI had already followed, the panel determined that MCI was capable and ready to serve a comparable geographic area. Thus, PUCO's decision was not arbitrary and capricious and the district court correctly affirmed PUCO's decision.

## V. CONCLUSION

PUCO and the district court applied the correct legal test-- whether MCI, the new market entrant, had the *ability to serve* customers in the same geographic area as SBC, the incumbent--and PUCO's decision that MCI satisfied this test

was not arbitrary and capricious. Accordingly, the judgment of the district court is AFFIRMED.